FILED
2025 AUG 12 AM 10:28
CLERK
U.S. DISTRICT COURT

Carlos Velasquez, Pro Se Plaintiff

Civil Bureaucratic Federalist

PHONE: 801.671.0371

P.O. Box 581365

Salt Lake City, UT 84158

| | |
|---|---|
| Plaintiff,<br>Carlos Velasquez Pro Se<br><br> v.<br><br>Amazon.com Services Inc. | OPENING COMPLAINT<br><br>Action on Constructive Termination |

Civil Action under a Preamble Approach

intended to vindicate the Rights of Workers

**TABLE OF CONTENTS**

I.    DEFENDANTS ........................................................................................ iii

II.   PERSONS OF INTEREST .................................................................... iii

III.  TABLE OF AUTHORITIES.................................................................. iv

IV.    DISCLOSURES........................................................................................ v

V.    PREAMBLE .............................................................................................. 1

VI.    ABSTRACT RESOLUTION OF THE CASE...................................... 1

VII.    FACTS AND BACKGROUND.............................................................. 4

  1.    FIRST INCIDENCE ............................................................................ 10

  2.    SECOND INCIDENCE ........................................................................ 14

  3.    THIRD INCIDENCE............................................................................ 14

  4.    FOURTH INCIDENCE ........................................................................ 16

  5.    FIFTH INCIDENCE ............................................................................ 20

  6.    SIXTH INCIDENCE ............................................................................ 22

  7.    SEVENTH INCIDENCE...................................................................... 23

  8.    EIGHTH INCIDENT ............................................................................ 27

  9.    NINTH INCIDENT .............................................................................. 31

  10.    TENTH INCIDENT.............................................................................. 33

  11.    ELEVENTH INCIDENT: DIRECT CIRCUMSTANCE OF RESIGNATION ........... 36

  12.    TWELFTH INCIDENCE .................................................................... 37

  13.    OTHER CIRCUMSTANCES .............................................................. 38

VIII.    ARGUMENTS........................................................................................ 39

  1.    BREACH OF CONTRACT, INTENTIONAL NEGLIGENCE ....................... 40

    A. Violations of the Code of Conduct.................................................. 41

    B. Irreparable Damage to Integrity of Leadership ............................ 43

  2.    WORKPLACE STALKING, HARASSMENT, HOSTILE WORK ENVIRONMENT .. 45

  3.    VICARIOUS INFLICTION OF EMOTIONAL DISTRESS,  ARBITRARY
        DISCRIMINATION AND RETALIATIONS,  DOCTRINE OF RESPONDEAT SUPERIOR 47

IX.    PLAINTIFFS FIRST CLAIM FOR RELIEF ................................... 50

X.   PLAINTIFFS SECOND CLAIM FOR RELIEF ................................................................ 52

XI.   PLAINTIFFS THIRD CLAIM FOR RELIEF ................................................................ 53

XII.   PLAINTIFF'S FOURTH CLAIM FOR RELIEF ............................................................ 54

XIII.   FIFTH CLAIM FOR RELIEF .................................................................................... 55

XIV.   PRE-TRIAL REQUEST FOR DISCLOSUES ............................................................ 55

   1.   Personally Important Documents ............................................................................ 55

   2.   Site-Specific Documents ........................................................................................ 56

XV.   CLOSING ................................................................................................................. 56

# I.   DEFENDANTS

Amazon, LLC, "Amazon.com," Amazon.com Services, Inc., by and through Site "DUT7" and Pioneer Region Human Resources

> Attn: Amazon LLC General Counsel
>
> Registered Agent: Corporation Service Company
>
> 300 Deschutes Way, SW Suite 304
>
> Tumwater, WA 98501

Alt Address:

> 15 West South Temple, Suite 600
>
> Salt Lake City, UT 84101

# II.  PERSONS OF INTEREST

Regional Human Resources (Pioneer) – Kerri Alger – keralger@amazon.com

Corporate Human Resources – Amy Nally – awwashle@amazon.com

Corporate Human Resources – Jerry Yeung

Amazon Logistics (AMZL/AMXL) Human Resources – Katy Brown – brownklq@amazon.com

AMZL/AMXL Site Leadership – Kevin Sargent – sargkevi@amazon.com

AMZL/AMXL Leadership – Vicki Soliz – vssoliz@amazon.com

AMZL/AMXL Leadership – Pablo Alvarez – pablavar@amazon.com

AMZL/AMXL Leadership – Margarita Wayman – mwwayma@amazon.com

AMZL/AMXL Leadership – Dalton Hanks – dalhanks@amazon.com

AMZL/AMXL Leadership – Shanese Walters – washanes@amazon.com

## III. TABLE OF AUTHORITIES

### Cases

*Newsome v. McKesson Corp.,* 932 F.Supp. 1339, 1343 (D. Utah, 1996) ..................................... 48

*Pierson v. Hubbard,* 802 A.2d 1162, 147 N.H. 760 ....................................................................... 5

*Tingey v. Midwest Office, Inc. et al.,* No. 1:2022cv00145 (D. Utah), ........................................... 48

# IV. DISCLOSURES

Exhibit 1 - Preliminary Offer of Employment, 10/19/2018

Exhibit 2 - Offer of Part-Time Employment, 4/18/2019

Exhibit 3 - Offer of Promotion (Level 3), 6/5/2021

Exhibit 4 - Letter Confirming Voluntary Termination, 7/24/2023

Exhibit 5 - RESERVED.

Exhibit 6 - Supportive Feedback Document, 6/22/2022

Exhibit 7 - Supportive Feedback Document, 6/29/2022

Exhibit 8 - Ethics Point, Complaint, 12/10/2022

Exhibit 9 - Plaintiff's Resume, 10/25/22

Exhibit 10 - Supportive Feedback Document, 12/18/2022

Exhibit 11 - Supportive Feedback Document, First Written, 12/18/2022

Exhibit 12 - Email Related to Ethics Point Complaint (12/10/2022), Add'd. to Kerri A.

Exhibit 13 - Ethics Point, Complaint, 1/20/2023

Exhibit 14 - Email from DUT7 Human Resources Disposing an Ethics complaint, 2/16/2023

Exhibit 15 - Ethics Point, Complaint, 2/25/2023

Exhibit 16 - Email to the Plaintiff, OpsHR Panorama, Disciplinary Appeals Query, 3/1/2023

Exhibit 17 - Emails confirming date of disciplinary Appeal interview, Plaintiff Talking Points included, 3/3/2023-3/9/2023

Exhibit 18 - Emails confirming Receipt of an Ethics Point Complaint, 3/3/2023

Exhibit 19 - Email confirming date for Interview, 3/3/2023

Exhibit 20 - Plaintiff's Email Follow-up after Interview, Listing three attachments, 3/7/2023 (needs attachments appended)

Exhibit 21 - Disposition of Disciplinary Appeal, Favorable to the Plaintiff, 3/10/2023

Exhibit 22 - Supportive Feedback Document, 3/15/2023

Exhibit 23 - Emails Disposing Ethics Complaint, Plaintiff Follow-up interrogatory, 3/20/2023

v

Exhibit 24 - Email from the Plaintiff to DUT7 "Management Team," Mismanagement Complaint (needs attachment)

Exhibit 25 - Ethics Point, Complaint, 5/10/23

Exhibit 26 - Email from Amazon Human Resources, follow-up from Interview, "Mismanagement Complaint," 6/2/2023

Exhibit 27 - Email from Plaintiff initiating a Legal Query, 6/12/23

Exhibit 28 - Email from Plaintiff showing a Legal Notice, 6/11/23

Exhibit 29 - Email Acknowledgement to Plaintiff, Personal Leave of Absence, 7/3/23

Exhibit 30 - Amazon Owner's Manual

Exhibit 31 - Amazon "Workplace Harassment & Equal Employment Opportunity Policy Acknowledgment Form," signed 10/20/2018

Exhibit 32 - Amazon "Code of Business Conduct and Ethics"

Exhibit 33 - Amazon Technical Academy Application Process

ALSO FILED

Victim's Unsworn Affidavit

## V. PREAMBLE

1. The Constitution of the United States of America is dedicated to the people without *exception,* and does manifest protective, injunctive, compensatory, and punitive reliefs for workers, interpreting and having observed the relevant *rights of workers,* who are people and may be employed, managed, and supervised by other such *workers* who are in *good faith,* or who take *exception* from *good faith* practices, against real tortfeasors including *employers* whose rights otherwise are in properly *conferential* order of any *withstanding* employment contract.

2. Jurisdiction is proper while the Plaintiff resides in the State of Utah, the United States District Court for the District of Utah, and the Federal Jurisdiction accepts a case or controversy, **28 U.S.§ 1331,** State laws may be used as rules of decisions where withstanding, **28 U.S. § 1652.**

3. The events related in the Complaint originally took place in North Salt Lake, UT and may have been extended into Seattle, WA and any States where Amazon LLC operations relayed direct communications.

## VI. ABSTRACT RESOLUTION OF THE CASE

4. COMES NOW action on conditions of Constructive Termination in context to a resignation coerced as stalked-after the Plaintiff in the workplace, *neglect* to *intentional neglect,* accompanied with repeated *retaliations* for apparent differences in Leadership Approach, to have undermined and usurped his natural authority at "Fulfillment" by Amazon.com Services, Inc. where he was employed four and a half years, two of which were in

1

Supervisory and Leadership roles where incidences took precedence, the corporate "Level 3 Process Assistant" and "Yard Marshall" roles at Amazon Delivery Station "DUT7," located at 989 W Center St., North Salt Lake, UT 84054; both roles with promise for *promotion;* the "At-Will" contract maintains inherent interpretive conditions who naturally manifest *good faith,* and violating such a Code of Conduct, corrupting the observable ethical Amazon.com Leadership philosophy, permitting others to violate it, failing to present constructive remedy, shows bad faith design on the termination/resignation of any such person or persons.

5. Repeated impositions of *false* and *insolvent disciplinary claims,* and subsequent *neglect* to address questions of *insolvency* and *false statements* on disciplinary records, conditions of direct *mismanagement* and *intolerance* for extraordinary circumstance tortiously dispositioned the workplace culture and rendered an ultimately *hostile* and *irremediable* environment, where repeated low order *retaliations* resulted in a failed attempt to terminate the Plaintiff, Carlos Velasquez, Associate ID: "VELACA," proved a point of impasse and *bad faith* wherein the Plaintiff could not recover *confidence* for *endorsement* from the same Management Team, nor rely on his own Performance Records versus questions of *bias,* nor have relied upon Amazon's having prompted the question and this application for review of Constructive Termination and relevant law, *confidence* in the "At-Will" employment contract failed where its Management Team and extensive Human Resources network rather colluded to maintain a *hostile* place to work, courted the Constructive Termination intentionally and negligently, and did *Breach Contract,* did commit themselves to *vicarious harm.*

6. Amazon.com, "DUT7," andor the Pioneer Region Human Resources agency treats disciplinary and behavioral disputes on a basis of **Absolute Privilege,** so we infer confidence on the basis of a mutual employment contract, the "At-Will Contract," whose contractual obligations are limited to the *at-will* term, and otherwise demand compliance with a "Code of Business Conduct and Ethics," and another document, "The Owner's Manual," both of which condition the cultural resolution of the "At-Will Contract," and do provision its Leadership culture.

7. Whether Amazon.com has *intended* at large to proceed on a policy of **Absolute Privilege** for Human Resources considerations while simultaneously having declared its "At-Will" conditions to be interpreted on the basis of conduct, or whether it was a regional malpractice, or simply a form of targeted abuse and harassment constitutes a question of whether Amazon.com does program vicarious harm generally, and did sublet a wrongful policy based in centralized prejudices improperly predicated on the term of "At-Will" employment, we say this was the expression made by so many Persons of Interest.

8. *Tortious interference* with "At-Will" contract; so many of those *persons of interest* actively engaged disorganized workplace *stalking* designed to either directly *harass,* or that amounted to extended *harassment* within a workplace that meets a *worker* standard for *civil stalking,* canonical *management-led stalking* described to be unethical prerogative leverage for *privilege, influence* and *power* within the workplace, the power to control *who works there* under the absolute "At-Will" term, canonical abuse of an Absolute Privilege, Abuse of Discretion otherwise, used largely to render environment *hostile* to the Plaintiff on even ordinary business needs.

3

9.  Members of the DUT7 Management Team *stalked* the plaintiff on an undefined prejudice for Constructive Termination, and high-level off-site Human Resources agents appeared to recognize the behavior and did not provide any relief from a long-term disposition that could clarify the quality of the plaintiff's workplace conduct, and the excellence of his workplace practices.

10. The plaintiff seeks Compensatory and Punitive Damages against Amazon.com postured *Respondeat Superior* for lost Retirement Savings, for Tortious Interference with the Promotion Opportunity, Invasion of Privilege and Fraudulent Misrepresentation by Publication and Transmission of Defamatory Information, Neglect and intentional Neglect to Initiate Constructive Termination, Breach of Contract, Vicarious Infliction of Emotional Distress to Maintain Conditions of Constructive Termination.

11. Persons of Interest repeatedly violated State and Federal anti-Stalking laws in the course of attempting to have controlled and scattered the Plaintiff's power to be successful in the workplace, and double to treble severed him from workplace austerity relevant to Human Resources, having attacked him at point of *immediate* to *historical memory* of incidence with gross abandon, who would abscond with the plaintiff's *work experience* and coerce his *work ethics*.

## VII.        FACTS AND BACKGROUND

12. Plaintiff resigned from Amazon, LLC. on July 24, 2023 after four and a half years of steady employment that began 10/16/2018 as a temporary Part-Time Associate at a "DUT1" in Salt Lake City, UT, was onboarded on 4/21/2019; and promoted to Level 3 Yard Marshall and Process Assistant after 6/25/21.

4

13. These statements relate disciplinary records compared against responses the Plaintiff entered, and larger Behavioral Misconduct complaints the Plaintiff reported to Amazon Human Resources, records in the company's keeping which, to the Plaintiff's knowledge, were open to managers and Human Resources, these documents are a format for documenting disciplinary variances.

14. The disciplinary policy in question related directly to "VELACA," the Plaintiff, and was proceeded largely on an ex converso construction of that policy wherein the several managers appear to have perceived themselves to be "absolutely privileged to publish defamatory matter concerning another in the performance of [duties]," *Pierson v. Hubbard*, 802 A.2d 1162, 147 N.H. 760 (N.H. 2002); See *Restatement of Torts, 2d §§ 553, 559, 581.*[1]

---

[1]RESTATEMENT OF TORTS (2D) §§ 553, 559, 581.

§ 553. Fraudulent Misrepresentations Inducing Gifts to Maker or Third Persons  One who by a fraudulent misrepresentation, or by the nondisclosure of a fact which as between himself and another it is his duty to disclose, intentionally induces the other to make a gift to him or to a third person is subject to liability to the donor for the loss caused by the making of the gift.

§ 559 Defamatory Communication Defined  A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

15. Starting late in 2021 **Pablo Alvarez, Johnathan Cowan**, and **Adrian Caldera** engaged in a conspiracy to issue *false statement* respecting the Plaintiff, "VELACA," in written disciplinary forms, in the course of that conduct the trio refused to hear facts about the incidence which would have adjusted their reporting; the facts were reviewable according to a Safety Manager who had been consulted by the Plaintiff; all facts were reviewable according to records of on-site surveillance.

16. In coercing false statements, they generated a social precedence for another Manager, **Devlen Bridges**, who colluded with **Adrian Caldera**, and **Johnathan Cowan** delivered yet another false and misleading discussion of the Plaintiff's conduct. At delivery they refused to hear facts and discussion which would have adjusted or pre-empted the issue.

17. After **Devlen Bridges'** termination, **Margarita Wayman** took on the role of direct manager to "velaca," and was either improperly influenced by those ADAPTS, andor later directly influenced by **Adrian Caldera,** and **Pablo Alvarez** to build a mismanagement standard which arrested competent reporting and discussion of the Plaintiff's performance.

18. **Adrian Caldera** and **Margarita Wayman** kept secret their disciplinary reservations against the Plaintiff from the time when **Margarita Wayman** took a promotion to Level

---

§ 581 Transmission of Defamation Published by Third Person (1) Except as stated in subsection (2), one who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character. (2) One who broadcasts defamatory matter by means of radio or television is subject to the same liability as an original publisher.

4, until around September-October 2022 when **Adrian Caldera** demanded from the Plaintiff that he admit his own behavior was bad, and even fatally unpopular, and to present that admission to subordinates as a self-improvement interrogatory.

19. The site was a consistent high performer in the Region; **Adrian Caldera** repeatedly sought to divest the Plaintiff of the merit of his *experience.*

20. Given the Plaintiff's several Documented Coachings did not address a more general than instant *performance impact,* it is plausible to the Plaintiff **Margarita Wayman** had inherited through **Adrian Caldera** and **Pablo Alvarez** criminal animus for the Plaintiff, a spirit of *pre-emptive* retaliation (discrimination), the plain cause of *good faith* versus *bad faith* Team Play, disagreements with management communicated a *bad faith* context, while leaving the Plaintiff with the choice and burden of knowing their trespasses.

21. **Adrian Caldera** and **Margarita Wayman** could not address nor resolve a complaint of *intentional mismanagement* that issued from the Plaintiff once it was apparent their disciplinary demands were trumped up, and the document was forwarded to the Site Manager, **Kevin Sergeant** and Human Resources, who could not recognize the scale of the complaint and took no action apparently to maintain comity between the Plaintiff and the two managers; altogether, they were *stalking* "VELACA" for *constructive termination,* in a long attempt to steal his *personal power.*

22. **Adrian Caldera** and **Margarita Wayman** conspired to have the Plaintiff terminated, and failed on an errant observation of *policy* related to the Associate *record.*

23. **Kerri Alger's** failure at intervention granted high-level corporate *consent* to whatever the management team's tacit scheme was, opting primarily to confidence the authority of the

written management statement and aiding their scheme of self-aggrandizement, **Kerri Alger** may have recognized the degree of *privilege* taken by these Persons of Interest and sought to offer them *protective relief* by improperly limiting her own investigations; she may also have *suborned* or *solicited* others by leaving open the implication of *harassment* andor *constructive termination,* and may have implicated *character assassination,* having conducted merely *cursory* reviews andor *invaded privilege* to have mollified the appearance of a plain *gross misconduct;* **Alger** seems to have recognized an opportunity to have allowed a Management Team an **Absolute Privilege,** and various members of Human Resources also appeared to maintain such a condition as *conspiracy.*

24. The Plaintiff's complaint to **Kerri Alger**, and a subsequent complaint *against* **Kerri Alger** for failure to review was addressed by **Jerry Yeung**, were pending from late summer 2022 into the first weeks of the New Year 2023.

25. **Kevin Sergeant,** then Level 7-8 Senior Manager, met with the Plaintiff to attempt discuss it, but largely eschewed the direct complaint and attempted instruct the Plaintiff to remain focused in his duties, and to not complain. The importance of the *standing* of site leadership overrode the circumstance of the complaint; **Kevin Sergeant** did not ever make any report of the meeting that would disclose its contextual reasoning, or how compromised elements within Management Reporting, questions on *performance, disciplinary issues,* would define any remedial conditions.

26. **Amy Nally** was an off-site Human Resources officer who was tasked to review the resultant disposition left by **Kerri Alger** and **Jerry Yeung,** and defined the ultimate precedence for the Plaintiff's resignation. **Nally** met with the Plaintiff via telephone, took

some notations or recording and could not make any recommendations on the Plaintiff's behalf, and left him to the mercy of the circumstance.

27. During the period between first and second complaint against **Kerri Alger** and **Adrian Caldera, Margarita Wayman** and **Caldera,** and **Shanese Walters** retaliated against the Plaintiff for the complaints he had issued against the two Managers between September 2022 and January 2023 by casually excluding him from the information loop, and then executed a *hostile takeover* of the Plaintiff's routine duties, they more or less embarrassed him in front of the post-holiday team, a single incidence.

28. The plaintiff presented a complaint against it, but again the Human Resources agency could not find anything wrong with the conduct, and protected the misbehavior under color of an **Absolute Privilege.**

29. **Adrian Caldera** and **Margarita Wayman** only accelerated their Mismanagement Practices, **Wayman** failed to conduct and maintain in-depth "Seek to Understand" ("STU") discussions, failed to admit or disclose *biases* regarding "VELACA," and failed to build a constructive dialogue that would pre-empt *stress* related issues; the Leadership team therein sought to exaggerate any possible harm or error, and attempted to have the Plaintiff put on a "Final Written" policy that would risk *termination* for *any error,* and lost on the internal Appeal for *misstatements* of the *final written* policy.

30. **Adrian Caldera** resigned from Amazon.com after taking a Human Resources recommendation for a Promotion in another company, a point advertised to the entire work crew the day of his departure; the apparent tenure of a pending *application* coincided with

the *escalation* of their mismanagement practice and was intended to inflict emotional distress.

31. **Adrian Caldera** and **Margarita Wayman** felt repeatedly encouraged to have disabused themselves of the Plaintiff, and once he had become the subject of tangible complaints it is plausible to the Plaintiff how the Amazon.com Human Resources agency lacked the wherewithal to control its Management Team and had programmatically encouraged Constructive Termination and leant *False Light* to Team Play ethics, they took the quality and dignity of the "At-Will" contract by abusing **Absolute Privilege** to publish information that was *hostile* to the Plaintiff.

32. All incidental facts were reviewable according to records of on-site surveillance, while the plaintiff refused to acknowledge or critically disagreed with multiple reports.

33. The issues against were extremely critical, and the Management and Human Resources Team neglected to take action once it was plain they had been accused of making *false statements.*

34. Much of the principle information from disciplinary issues was provided by **Katy Brown** via email, was recorded in PDF format, or stored the plaintiff personal Gmail account, and are provided to a record, labeled as a Pre-Trial Exhibit cit. **28 U.S. § 1732,** record made in regular course of business; PDF Copies.

35. Any information that could be considered to be proprietary or confidential by Amazon.com is filed and labeled as a Pre-Trial exhibit cit. **28 U.S. § 1732.**

## 1. FIRST INCIDENCE

36. According to the Plaintiff, the first "Documented Coaching" issued from the Plaintiff's direct-report Manager, **Pablo Alvarez,** who alleged the plaintiff had committed two actions of *gross insubordination,* on a complaint the Plaintiff had worked through some several lunches, and on the exaggerated complaint the Plaintiff had repeatedly refused to follow a Holiday-Peak *safety* rule the manager was instituting after another Associate was nearly struck with a heavy cart due to an overburdened work space on the Inbound/Outbound Dock of the Delivery Station. (November/December 2021) [Exhibit No. 5,   **Reserved**]

37. Verbally, the plaintiff attempted to correct the Manager, declared he had to use his own discretion in capacity to the Yard Marshall role, and also included how the Manager was repeatedly *unavailable,* and so the plaintiff had to consult the Warehouse Safety Manager, a Level 4 Manager, who agreed it appeared safe to continue. Later, when **Pablo Alvarez** returned he refused to hear the diligence conducted by the Plaintiff, and incorporated a distortion of events into documentation the Plaintiff had skipped several lunches.

38. More specifically, the manager related the rule to the Plaintiff prior to the Start of Shift, and the Plaintiff agreed. The Manager's complaint issued wherever the Plaintiff *continued* unload freight within his discretion, which, according to the Plaintiff was anytime the dock had sufficient space.

39. **Pablo Alvarez** issued his request for the Plaintiff to discontinue unloading unsorted Amazon Freight *three different times* on the same shift, and, according to the Plaintiff, within ten minutes of each of those directives was out of radio communication so the Plaintiff was compelled to evaluate the limits of his discretion on the *uninterrupted task,* which is the formal term advised by Amazon.com when training the Plaintiff in the Yard

11

Marshall role; it is also plausible the complaints issued by way of a proxy with whom **Alvarez** was more familiar, and who may have been zealous to uphold a rule without evaluating how to *Earn Trust* in the Plaintiff and Yard Marshall position; it is plausible to the Plaintiff **Pablo Alvarez** and the acting Process Assistant on the shift, **Melissa Murano,** capriciously and intentionally enforced the rule to instigate semi-organized *Stalking,* and the subsequent behavior of **Pablo Alvarez** did not permit the Plaintiff to reach another conclusion once the disposition was tangible in all business activities.

40. **Pablo Alvarez** may have held a *conflict of interest* at the core of his Leadership principles, the Plaintiff had recently resolved an intra-network scheduling conflict that would have positioned him well for a management interview, effectively having networked a solution for *late delivery times* that had plagued DUT7 Sortation Shift for months, which involved independent exercise of the Yard Marshall *authority* with Management and Leadership at the Regional Fulfillment Center. Hitherto the Management Team had expressed confusion and powerlessness at the prospect of communicating with off-site management. The Plaintiff's Exercise of the Yard Marshall discretion independently may have made **Pablo Alvarez** feel insecure and he may have *retaliated* pre-emptively; restated, **Pablo Alvarez** may have discriminated against the Plaintiff's *leadership* ethics.

41. The Plaintiff raised the disagreement to the attention of Human Resources, **Johnathan Cowan,** who dismissed the "fraud" allegation out of hand, and refused to hear the Plaintiff out.

42. When the Plaintiff spoke again to **Pablo Alvarez** he was confronted by him, **Johnathan Cowan,** and **Adrian Caldera** who all three directly attacked the Plaintiff's account without

any clarifying statement; they overrode the Plaintiff and violated Corporate anti-Harassment Policy. Again, their presentation communicated *bias* for "Absolute Privilege," given there was no status for verification of statements made, and the Plaintiff claims to have recorded an objection against the factuality of the document.

43. It is important to note how **Adrian Caldera** was not a part of the exchange, but happened upon it and acted impulsively to amplify the verbal assault.

44. The Plaintiff REFUSED TO SIGN the "Documented Coaching" and only later reported details of incidence in an ethics complaint; **Devlen Bridges** was the Plaintiff's Direct Report manager, and placed the entry for "VELACA."

45. **Katy Brown** for Human Resources declared she could not find the Documented Coaching from 2021, the document had *deprecated.*

46. Later, when **Kerri Alger** was alerted to the disposition she was made aware of the Safety Manager's potential insight, but appears not to have reached out to him.

47. It is plausible to the Plaintiff **Kerri Alger** privately demured from evaluating *video records* of the site in order to offer **Pablo Alvarez, Adrian Caldera,** and **Johnathan Cowan** *protective relief* under color of Management Authority, the **Absolute Privilege.**

48. **Johnathan Cowan** also resigned from DUT7 in that timeframe leading up to Summer of 2022.

49. The Plaintiff did not report the incident until *after* it was apparent the Management Team had lost control, which did not become apparent until a second Documented Coaching issued on 6/22/2022.

50. The plaintiff retains a copy of a Resume from that period listing under its "Proven Management Success" the "Repair of Incompatible Delivery Times, SLC9->DUT7," and "Clarification of Unified Reverse Logistics for deployment for SLC9," with network hyperlinks to those *transactions* where resolved critical site issues. See Plaintiff's Exhibit No. 7.

## 2. SECOND INCIDENCE

51. It is plausible to the Plaintiff, **Devlen Bridges,** was self-destructing either at missing a promotion, or had found temporary dissatisfaction at "Fulfillment," he was acting-out his frustration against the Plaintiff, and either under coercion from **Adrian Caldera** andor **Johnathan Cowan,** or **Pablo Alvarez,** did falsely report four separate disciplinary instances on dates 5/29, 5/31, 6/8, and 6/9. Again, the delivery made by **Adrian Caldera** and **Devlen Bridges** communicated *bias* for "Absolute Privilege."

52. The Plaintiff REFUSED TO SIGN and later reported details of the subject incidents in an ethics complaint. **See Fourth Incidence.**

## 3. THIRD INCIDENCE

53. The second Documented Coaching issued on 6/29/22, **Devlen Bridges** falsely compared a *Failure to adhere to standard work guidelines* on three occasions 6/13, 6/22, 6/27, for an "ATLAS Dynamic tracker" used to validate whether On-Site Safety had actually trained an Associate for a given role *prior* to the Shift's *labor encoding;* it was many months before that process was sufficiently refined to rely upon, and the Documented Coaching was part of *separational-disciplinary entrapment* that was ongoing; it was easy for Level 3

14

Associates to make *labor encoding errors* in that time-period, and the system was not operating until Spring 2023.

54. It should also be noted at this time, individual *Performance Tracking* for "VELACA" completely fell-off or was reset, and the Plaintiff was under the impression after Spring 2022 that his Performance Evaluations had been deleted and reset due to an administrative decision. When **Devlen Bridges** made that delivery at the Plaintiff's quarterly Performance Evaluation, it was conducted under *false light;* on transfer to management under **Margarita Wayman** it is unclear what was communicated between the two, or what impression **Wayman** took from reading any such documentation respecting the Plaintiff.

55. **Devlen Bridges** may have been under investigation by Amazon Human Resources at the time.

56. **Devlen Bridges** was terminated or resigned between Summer and Autumn of 2022, was a secondary witness to the Plaintiff's refusal to sign the first "Documented Coaching," and may have had a grievance against **Pablo Alvarez** for either retaining knowledge of plausible misconduct, or for competitive differences, and also have held a grudge against **Adrian Caldera.**

57. **Devlen Bridges** was likely terminated either on a Drug Policy violation, or on a No Fraternization policy violation, **Devlen Bridges** may have *disfavored* the Plaintiff for promotion on a *retributive* basis (retaliation) wielded against Amazon.com by and through its Human Resources Agency, knowing either its casual *forensic* culture, or even hatred for the Plaintiff.

58. It is plausible to the Plaintiff another proxy, **Shanese Walters,** a Process Assistant who worked adjacent to the Plaintiff under **Devlen Bridges,** had solicited the manager under a quiet policy for *favoritism,* "Favoritisms" are expressly forbidden under Amazon.com, just as *harassment* and *stalking,* because it obstructs other individual growth, and may disorient team objectives.

59. *Favoritism* used to conduct *stalking* designs and implements wrongful prerogative leverage within the business culture.

### 4. FOURTH INCIDENCE

60. As related from the Second Incidence, and bears the collateral detail.

61. On 12/10/2022 the Plaintiff filed an "Ethics Point" disciplinary complaint through an off-site Web Portal located at: "https://secure.ethicspoint.com," and reported a complaint against **Devlen Bridges, Adrian Caldera,** and **Johnathan Cowan** citing harassment, disciplinary fraud, and character assassination that took place "At or around the HR Desk," and reported the incidence as part of a greater movement.

62. Incidence detailed Allegations against all-three individuals, against **Devlen Bridges,** "FRAUD," "NON-CONSTRUCTIVE COACHING," and "CHARACTER ASSASSINATION," where it was detailed, "I received a very serious coaching statement from him detailing several other Amazon Associate complaints more or less conduct which may have been felt to be too curt in non-specified instances." See Exhibit No. 8 (Reproduced verbatim with some omissions).

63. "A quote was provided on the page of the coaching which depicted me as being highly critical of a person whose accommodated health condition Amazon.com was aware to look

out for. I was depicted as making a statement more or less in malice against the Associate."
*Id.*

64. "What happened in actuality was that I had in fact stated to the associate how she appeared in 'fine' health. This was a statement in candor, which seemed to be appreciated at the time." *Id.*

65. "I then proceeded to ask the associate whether the discomfort experienced required immediate attention, or if she might be capable to continue in her then-present role." *Id.*

66. "The Associate stated next that she was okay, but that she was sure some adjustment would be necessary." *Id.*

67. "I was prepared to call a Learning Ambassador to stand-in, however the Associate stated her condition was not yet overwhelming." *Id.*

68. "I then RADIOED devlen for his more or less immediate assistance on the floor, for his familiarity with the Associate' accommodation…" *Id.*

69. "I advised the Associate we would have devlen appear to make any appropriate considerations, for his familiarity and confidentiality related to the accommodation." *Id.*

70. "I did not receive a response from devlen. The incidence took place near the labor board, at C-D Cluster spur where the Associate was tasked." *Id.*

71. "Devlen was situated on the dock, was somehow engaged in a manner which may not have allowed him to respond." *Id.*

72. "I RADIOED devlen a second time, and he advised he would come out onto the stow floor before too long." *Id.*

73. "It was more than fifteen minutes before devlen arrived." *Id.*

17

74. "I was occupied with Floor Monitoring duties, including labor tracking, individual stow rate monitoring, and any other safety conditions." *Id.*

75. "I passed the Associate several times in my other duties, and she did not demand my attention directly, and did not demand any other individual's attention." *Id.*

76. "Several minutes later I found devlen had arrived and had addressed the issue. Based in his direct knowledge of the issue, devlen made a minor path adjustment for the Associate who continued through the end of Sort Shift." *Id.*

77. "Once the coaching issued, it came blindsidedly, out of issues not prior raised, and of dubious import." *Id.*

78. "However, the management team therein, devlen and adcald, refused to acknowledge the difference in the narrative and more or less accused me of refusing constructive coaching." *Id.*

79. "I was depicted as being somehow beligerent and even unconscionable." *Id.*

80. "I was so stunned at the abuse I left the room paralyzed, and devlen submitted the coaching without my signature, with a specious statement of my neither accepting nor declining." *Id.*

81. "I later brough this complaint to the attention of the Human Resources manager (Johnathan Cowan) who improperly deflected responsibility for what I openly stated was a kind of Fraud; both in the conference with Devlen and Adcald, and in confidence Jonathan Cowan more or less attempted to blame me for delay in response which rendered any single individual issue unaddressable." *Id.*

82. "Jonathan Cowan made no record of anything that transpired thereon, so only the incoherence of the written document is tangible. The management team undertook so little diligence on these problems more or less attempting to prove either the Amazon Human Resources network is corruptible and neglectful, and otherwise were attempting to render me more vulnerable to criticism, social engineering, bias or abuse otherwise." *Id.*

83. "The correct and best approach is to amend the coaching statement to fit any substantive discussion, and to maintain the old statement only as a discussion point, so to deflect non-constructive bias whether affirmative or negative to any intended result." *Id.*

84. "I have not seen the Management Team take a personal interest to clarify its own misapprehensions. The several complaints put forward are similar in that adcald and Jonathan Cowan both routinely violate the law, and breach confidence to bias toxic coaching standards." *Id.*

85. "OTHER LIABILITIES: This written coaching issued the very same week as Amazon Technical Academy was making decisions for admissions. The ATA admissions paradigm rejects any applicant with an active coaching, an ADAPT, and this coaching may have been issued to prevent or pre-empt a favorable decision rel. to ATA." *Id.*

86. The Plaintiff uploaded a written out version of the same complaint, and a lost "Ethics Point" document.

87. "The HR team in this region did not conduct a sufficient inquiry with [Amazon Associates], did not evaluate the breadth of her perceptions, nor did any of these individual conduct a Seek to Understand dialogue with me on the separate ADAPTable question." *Id.*

19

88. **Kerry Alger** responded to the Plaintiff on this complaint, and promised to reach out to [Amazon Associate] who had transferred out of state to another Amazon facility; **Kerry Alger** may have recognized the Level 1 Associate after processing the document; alternatively, it is plausible to the Plaintiff the complaint was made not by [Amazon Associate] but by **Bridges:** in either event, the disposition from Human Resources left the question unclarified.

89. A follow-up query (1/20/23) was improperly *deflected* by **Celestia Browning** on (1/26/23).

90. Human Resources did not ever identify the process it undertook, did not describe any inherent limitations thereto, and did not limit the plausible disposition; the result was that every statement identified was held to be *true*, while the background statements made on 5/29, 5/31, 6/8, were also reinforced as *true* per se while the Plaintiff's detail of the circumstance does not permit a cursory disposition.

91. It seems plausible to the Plaintiff, **Kerri Alger** and **Celestia Browning** merely overruled the plaintiff on the basis of Absolute Privilege, or it is even plausible they were posturing *litigious* circumstance, the Plaintiff's complaint falls into a completely *post facto* prejudice where Human Resources affirmed *unverified* statements.

### 5. FIFTH INCIDENCE

92. On 12/18/2022 **Margarita Wayman** delivered a false and unverified "First Written" warning after interrogatory conducted by **Celestia Browning/Leme,** Human Resources, on 11/23 twelve days after the plaintiff was alleged to have made off-color statements to an Associate. Again, their presentation communicated bias for **"Absolute Privilege."**

93. The report is plausible to have been *retaliation* for an Ethics Complaint filed by the plaintiff on 12/10/22, primarily because the incidence in question was a passing conversation, the Associate may not have felt familiar with the Plaintiff to appreciate *any* comment, or attempt at conversation, lasted less a very short time, and may have behaved vexatiously to even make the complaint.

94. The report is plausible *retaliation* because it may appear to communicate a cautionary innuendo against *behavioral complaint,* that it was intended to insinuate *intimidation* into the disciplinary culture; Again, their presentation communicated *bias* for **"Absolute Privilege."**

95. The report is plausible *retaliation,* the First Written Warning accrual was an *escalated* behavioral misconduct, and appears *related* to the two "Documented Coaching" issues which were of a separate subject-matter, and were by that time *colorable.*

96. *Retaliation,* the **"Absolute Privilege"** narrative communicates an illiberal work ethic who attacks a perceived "outsider," canonical "Not a Team Player" narrative, one who would betray the *confidence* of the team and encourage perceived *negative exposure.*

97. A Documented or Written Coaching may not have been an appropriate response considering how it was a comment in a line for a payment kiosk in the breakroom or "cantina;" maybe it was perceived to be bland, or maybe the Associate knew of someone who had committed theft and felt provoked, whatever Associate made the complaint, the complaint itself was a retaliatory means of attempting to intimidate the Plaintiff, and Celestia Browning/Leme and Margarita Wayman recognized that expression and sought to elaborate a narrative of how the Plaintiff was a pariah.

### 6. SIXTH INCIDENCE

98. The following incident led directly into a failed attempt to terminate the Plaintiff.

99. On 12/18/2022 Margarita Wayman issued a "Behavioral—First Written" documentation and stated, "DETAILS OF CURRENT INCIDENT/SPECIFIC CONDITIONS On 11/28/2022, 11/29/2022, 11/30/2022 you failed to follow appropriate standard work practices. Specifically, you failed to correctly code AA to their assigned functions. A seek to understand conversation took place with you on all three dates listed above to which you stated: Sorry for the miscode, I will improve next time on the coding and make sure it is more accurate. I will also do better to communicate with Shanese for changes that occur with assignments on the dock." See Exhibit No. 10.

100.    It was reasonably stated under "Areas of Improvement Required by Associate," how "Amazon expects associates to adhere to standard operating procedures with regards to processing orders in each function within the delivery station." *Id.*

101.    The Plaintiff did concede it with caveat, "These specific errors were mechanical errors in Labor Process coding, non-deliberate and may have been related to stress. I will attempt to prevent such errors in the future. To my knowledge these were mechanical errors." *Id.*

102.    It is plausible to the Plaintiff, **Margarita Wayman** was attempting to have justified **Adrian Caldera's** favoritism for **Shanese Walters** by exaggerating the meaning of the job site impact, it was provoked after **Walters** issued the change-up via Radio communication that went unheard by the Plaintiff.

103.     This *incidence* leads into an attempt to *coerce termination,* where repetition of the action six months later showed a *mechanical* and not a *contextual* error, *Coaching* to *Final Written* disciplinary status, **Margarita Wayman** seems to have inappropriately collated an actual *mechanical* encoding error against an atypical request from **Shanese Walters.**

## 7.  SEVENTH INCIDENCE

104.     On 1/11/2023, **Adrian Caldera** and **Shanese Walters** executed a hostile takeover of the Plaintiff's assigned duties, while simultaneously discriminating against other associates. An "EthicsPoint" report was filed on 1/20/2023. See Exhibit No. 13.

105.     Incidence detailed allegations against **Adrian Caldera** and **Shanese Walters**, "Social Engineering, Statements negatively characterizing an individual performance intended to manipulate management decisions…Individual role selection issue;" and "SOCIAL ENGINEERING and partial RETRIBUTIVE HARASSMENT." *Id.*

106.     The complaint shows amazon codenames, and also included the name **Margarita Wayman**, "CONTEXT End of Sort to Pick and Stage transition," According to the Plaintiff's Affidavit, the *labor shift* is divided between an eight hour segment, and a two-hour segment, called *Sortation* and *Pick and Stage,* respectively. *Id.*

107.     **Adrian Caldera** was reported to be the acting Pick and Stage manager, contexted the incident, and then described WHAT happened, "The Process Assistant returned from GEMBA while I was operating in GATEKEEP, and immediately noticed an associate operating to pick and stage 'Full Routes' whom she did not favor for the process. We discussed the issue and I was overruled by the manager on the subject. The sole reasoning

presented by the PA was how she believed the individual was attempting to harm herself to find her way into a new accommodation." *Id.*

108.    "I was incredulous at the expression by the PA (Process Assistant), out of consideration that we were very far ahead in timelines to complete the process. Given also how operating 'full routes' is open-ended with confidence to the time available to pick a route, my application was not addressed." *Id.*

109.    "[**Adrian Caldera**] interjected over this, stated his expectation over the timeframe for utilization, did not address the statement by the PA and then expressed how he favored the PA for the GATEKEEP role over my efforts on it." *Id.*

110.    "Next, he adjusted our immediate PICK RATE standard from 375 to 400 to favor a discussion escalating my decisional role-simultaneously accusing me of understaffing us. He looked squarely at the other PA doing this, in a show of direct confidence thereto." *Id.* Note: The Plaintiff intended to express how **Adrian Caldera** did not care if any of his reasoning was understood.

111.    "The PA did not think twice about accepting and enforcing an arbitrary change in production standards while we were projected to be ahead by more than 40 minutes. (SOP at Pick and Stage requires a 30 Minute buffer, and our standard practice regarding individual VTO issues is based in anticipated time to completion)." *Id.*

112.    "Both abused their roles in capacity to express unqualified disfavor, more or less to allow themselves at an advantage over other individuals in their work flow." *Id.*

113.    Next a direct narrative of the incidence out of Leadership context, "[**Shanese Walters**] expressed an process objection to an individual labor assignment asserted, against

the wisdom of this PA," [associate codename omitted] is trying to hurt herself to get back on her accommodation." *Id.*

114.     "I responded, 'Really?'" *Id.*

115.     **[Shanese Walters]** Replied in the Affirmative, claiming witness over [Amazon Associate] intentionally lifting heavy shipments." *Id.*

116.     The complaint provides further context demonstrating the *work accommodation* context; the *Operation* context of the "Routing System" programs *manifests* for individual delivery drivers, and assigns the "Pick and Stage" associate to *pick* the assigned route from its place on the Stow racks, and *stage* it at a location convenient for *drivers* to take responsibility over the *work.* Typically a *pick list* constituted one third of a *full route.*

117.     The Plaintiff, "MY REASONING Given there was an extensive lead on the time available to pick certain routes, I agreed at [associate]'s request to allow her that process out of consideration for the level of uncertainty she expressed more or less on a limited basis." *Id.*

118.     "The Question is primarily about Bias for Action, self-reliance, completing a whole process, and taking new confidence. Similar to processes veteranizing individuals, nesting individuals, and coaching individuals, I found we had the time and the process showed it." *Id.*

119.     "I was not allowed to explain. [**Adrian Caldera**] did not allow me to explain, and took that success directly from me and awarded to someone else." *Id.*

120.    With some omission, "Essentially I was attempting to allow the Associate a limited advantage against her previous accommodation status, while we had plenty of time to complete staging." *Id.*

121.    "The L6 (**Adrian Caldera**) attack on my adjusted Headcount neither correctly identified the ten-relevant status, nor informed other issues. Instead, the interjection served to interrupt the direct the direct discussion, to actively divert and/or misdirect it, failed to disposition what was being discussed, and ended in a declaration of his favor the [**Shanese Walters**] stating his preference for her standing in the Gatekeeper role." *Id.*

122.    "The adjustment expressed an indefinite disciplinary standard in a manner intended to attack my credibility; the L6 has a low-level strategy for personal attacks wherein he adjusts his ethical posture from retributive to accommodative, his behavior in essence mirrors the behavioral and procedural ethics of the individual attempting to render a limited exception to aid individual growth while the outcome of the Standard Process is not in peril." *Id.*

123.    "Just to clarify the above paragraph, the L6 basically imitates the ethical posture of the individual, condescending in error even malice, and then renders a repeatable disfavor to the individual PA who makes a leap in good faith. It is actually predatory, zero-tolerance, zero-respect, and not justified on an actual principal than speculated." *Id.*

124.    One comment, "L6 does tend to aggressively favor the [**Shanese Walters**], and while I respect zealousness in the Management Team's interest to cultivate an individual when the opportunity is tangible, L6 has a tendency to also have avoided communicate

direct versus indirect standards, and risks damage the process, and with it individual confidence." *Id.*

125.    The complaint shows several witnesses, as well.

126.    The complaint was dispositioned by **Celestia Browning/Leme,** and failed to address the more precise scope of her investigation. See Exhibit No. 14.

127.    It is plausible to the Plaintiff the language is *under misuse* by the Human Resources agency there, it appears to be boilerplate, "No further action is needed from you," and, "As a reminder, Amazon has a policy prohibiting retaliation against anyone who has raised a complaint or who has participated in an investigation," and, "Thank your again for your cooperation," are rendered under *false light,* and intimate a process of weak *deflection* that disfavored him.

128.    It is plausible to the Plaintiff, the incident was *retaliation* for the commencement of a complaint process in December of 2022.

129.    It is plausible Amazon Associates who were described as witnesses to the complaint desired the *constructive termination* of the Plaintiff, or even desired a more *absolute advantage* in the workplace.

### 8. EIGHTH INCIDENT

130.    On 3/1/23, the Plaintiff was advised of an opportunity to appeal a "corrective action," and it was affirmatively notified a "Date and Time" to *appeal* a "Final Written Warning through the Amazon Appeals Process by meeting with the Senior Site Leader." See Exhibit Nos. 16 and 17.

131.    After confusion over whether it had been scheduled, a date was set for 3/10/23 at 8 AM, a teleconference, "The appeal process will have you presenting your concern directly to the site leader." *Id.* The plaintiff attached a binder with some documentation, and his talking points.

132.    The Talking Points addressed three major factors that could contribute to having discredited a "Final Written Warning," a "FIRST instance of this process depicted an individual flippantly using the scanner as a cause for issue." Spec. Exhibit No. 17.

133.    "In my view this a trust versus bias issue; I think the manager may have other biases which he or she is attempting to misdirect, or reserve, meaning the ADAPT is NOT interested to capture a true Root Cause at a pragmatic policy level discussion, even though it is severe in its tone to have to take seriously." *Id.*

134.    "The HR policy level discussion is simply too prejudiced to recognize this discussion as anything other than Insubordination; the prejudice, I fear, is intentionally misplaced." *Id.*

135.    "HR on-site is not prejudiced to represent the Associate versus Manager where a policy dictum appears violated, even if the Root Cause discussion has not been addressed." *Id.*

136.    "The SECOND instance took place in mid to late February, and was the exact same error. I say 'error' because I literally could not have anticipated it; it was not like forgetting something and then remedying it later while preoccupied, it was an unforeseeable cognitive/rational lapse." *Id.*

137.    Some content omitted, "Rather than hear me out, and generate a more sensitive level of discussion, she ignored me and repeated aggressively the policy standard sought. More or less attempting to discipline me without appreciating my most direct position, and so generated a second disposition on delivery of a verbal STU." *Id.*

138.    Provided discussion from the binder, the same "EthicsPoint" complaints from 12/10/22 and 2/25/23 already demonstrated under the **Fourth** and **Seventh Incidences,** noting the teleconference with **Jerry Yeung,** "I seem to have become a target possibly based in management behavioral queues surrounding False Statements rel. to question of my conduct. I have attempted to demonstrate at least THREE instances with THREE different managers wherein an L6 critically disrupts a discussion to coerce the entry, to ignore valuable information, and to disfavor further fact finding." *Id.*

139.    "This type of low-level retributive context may have been more prevalent early in December, and may have contributed to excessive stress." *Id.* The document also presented a relevant TIMELINE.

140.    The third cause, "I have an unrelated independent civil litigation ACTIVE during this time, which does require an enormous level of effort." *Id.*

141.    "Whatever prejudices or preconceptions you, or any of us may have about Pro Se and prejudiced legal or civil claims, I assure in confidence I am in good faith. Moreover, any of us may also understand that an actual Fraud committed by a Federal Officer works to disestablish the individual critically at the level of his most conscious efforts." *Id.*

142.     "For whatever reason, the energy I had committed to my extrinsic legal process may have undermined my conscious attention. (I was holding back to back 80 to 100 hour work weeks)." *Id.*

143.     "TIMELINE: 12/1/22 I filed an Appellate Brief in U.S. Court of Appeals for the Tenth Circuit." *Id.* The binder demonstrates a Docket slip from a case showing the Plaintiff's name, shows the appeal was pending through that time. Note: the Appeal did not discharge until Summer 2023, and remains the subject of ongoing litigation against United States Judiciary, Judges Howard Nielson and Jared Bennet are alleged to have compounded a *Fraud on the Court* question with new *malpractice.* The case may be filed concurrently with this one, and is action to relieve the Plaintiff from repeated assaults on his personal and civil rights.

144.     The "CLOSE" of talking points speculates on *prejudice* that may characterize plain demonstration of a *perception* of a *hostile environment,* "Because the management team may yet harbor improper prejudices and reservations which disrupt intended issues, Amazon.com should consider to make an EXCEPTION from a FINAL WRITTEN WARNING status, and may also choose to REJECT one or both of these ADAPTS." *Id.*

145.     That document was available to Amazon Human Resources, its "Appeals Team," after 3/9/23.

146.     The *teleconference* took place as planned, was conferenced with a Senior Site Leader from a different territory who brought to bear, according to the Plaintiff, how the rule compounding the infraction in itself was improperly enforced, given that both its *cause* and *timing* for 60-day deprecation of the record since 12/18/22 to 2/19/23, and rescinded

the "Final Written Warning." Note: There is not a source for the rule, given how **Kerri Alger** did not ever respond to the Plaintiff on the question of policy level documentation for ADAPTS issuance and review. It may be the *rule* was simply an interposition from a different leadership perspective.

147.    It is Plausible to the Plaintiff, the issue that was dissolved after 2/19/23 was a retaliation. As expressed from his written Talking Points, the impact of negative results and unresolved questions for ongoing mismanagement questions, besides personal issues that were beyond the willingness of Margarita Wayman and Adrian Caldera to have engaged, conditions to have exaggerated and misdirected corporate bias, "Bias for Action," were ripe.

### 9.  NINTH INCIDENT

148.    On 3/15/2023, **Adrian Caldera** and **Margarita Wayman** initiated a process to attempt to terminate the Plaintiff.

149.    A "Behavioral—First Written" ADAPT defined a "First Written" context which according to policy would have resulted in a summary termination of the Plaintiff from employment with Amazon.com for *cause*.

150.    The "Behavioral—First Written" identifies the dissolved disciplinary issue from the Eighth Incident, and the Plaintiff admits the relevance of the Policy Level discussion on Labor Encoding questions, and disclosed the Root Cause from February, "I was asked to recognize this ADAPT process is NOT an exception or a accommodation for any kind Standard Process, and I fully agree and will work to maintain more perfect standard for staffing process in general. Pursuing this, I did use some sensitive language above, in the

previous discussion on this subject, and all that I can disclose is that I was under some more high-level stress which may have contributed to the oversight. I am a little concerned the ADAPT is postured liberally without regard for the scope of the error, which is stress related, and is difficult to anticipate. Meaning, the ADAPT could be used to define an issue at any point without very constructive discussion. In this instance, I attempted to communicate how this issue was not entirely avoidable and found the L4 was in a posture unable to hear exactly how. This seems to be in line with the policy discussion regarding retraction of a Final Written Warning, that the issue cannot repeat over 30 days. A more complex discussion would have originally framed this issue efficiently." See Exhibit No. 22.

151.    **Margarita Wayman** produced the *same* complaint context as was prior attempted; The issue describes the overall impact to process from February, *after* the *appeal,* and recasts it to be a "Behavioral – First Written," and not a "Final Written."

152.    It is Plausible to the Plaintiff, **Margarita Wayman** was engaged in a format for high-level *retaliation* whereall she took justification in her own zealousness to have attempted, or even merely postured attempt it, *protected* the work site's *production history* from even unintentional to mechanical errors.

153.    *Reissuance* showed total disregard, *intentional neglect,* of the meaning of a "Coaching" question who seeks to have understood ("STU") the facts *before* a record of impact, and communicated **Margarita Wayman** and **Adrian Caldera** total disfavor for the Plaintiff, as well Human Resources total deference to their whim.

154.    The action may have deliberately inferred *vicarious harm* upon the Plaintiff, a will to promote encouraged by both **Pablo Alvarez,** and **Adrian Caldera,** and a will to misbehave encouraged by **Devlen Bridges** and likely **Shanese Walters,** it was the consistent bias of the Management Team supported Human Resources Team, including more powerful Regional and Central Human Resources who overlooked the Plaintiff's most substantive questions and failed to advise, that **Margarita Wayman** captured in that 3/15/23 document.

155.    Restated, it was misbehavior derived out of unchecked *stalking* ethics who would see the victim as his or her own worst enemy.

## 10. TENTH INCIDENT

156.    On 5/10/23, the plaintiff was prompted to complain for the last time, at the end of the day's shift **Adrian Caldera** and Human Resources announced he would be leaving the company to take a promotion at another company, "It has come to my attention an individual who is subject of a serious intentional Mismanagement Complaint is being offered a recommendation from Amazon.com, the individual admitted this in confidence to the team, on terms for happy departure from the company." See Exhibit No. 25.

157.    "The extent of 'Intentional Mismanagement' is sufficient to constitute 'Stalking' under Utah law, and whether Amazon.com will file a sufficient legal complaint is a relevant question." *Id.*

158.    "That is, the individual has dispositioned numerous very close working relationships, has damaged the integrity of several managers." *Id.*

159.     "New incidence arise where the team openly discloses his impending departure."
Id.

160.     "For example, [**Adrian Caldera**] now exchanges personal contact information with
[Amazon Associate] who is a reliable member of the management team, and may maintain
destructive influence thereby while [Amazon Associate] may be unwitting." Id.

161.     "For example, [**Adrian Caldera**] may also maintain personal contacts with
numerous members of leadership and management, who may be more or less under his
most direct influence incl.: [**Pablo Alvarez**], [**Margarita Wayman**], [**Shanese Walters**]."
Id.

162.     Some parts omitted, "The company must consider to HOLD its recommendation
pending an investigation. The individual leaves on poor terms." Id.

163.     It is plausible to the Plaintiff **Adrian Caldera's** Corporate Recommendation and
Plan to Leave Amazon.com were prompted by his knowing gross misconduct andor that
Human Resources in its general knowledge of circumstances offered him *protective relief*
by sabotaging its investigations and colluding against the plaintiff.

164.     The complaint was also addressed against **Kerri Alger** for failing to protect the
Plaintiff from management bias more plainly, to have addressed the longer standing
question of *mismanagement;* she contemned the victim of their conspiracy.

165.     "Issue #2" addressed against **Kerri Alger** largely speculates against *intentional
neglect* wherein she looked at a document and declared how there was not plain "fraud"
within the document, and implicated a larger policy to have withheld an integral question.
**Alger's** direct mismanagement was entirely designed to define Constructive Termination

and may have held out the most hostile promise against the Plaintiff, by referring to him within the business culture as the defect per se, "[**Kerri Alger's**] lack of insight compares intentional neglect to further magnify harm, in this instance she may be allowing [**Adrian Caldera**] the opportunity to get away with, and further glamorize, his own criminal mystique." *Id.*

166.    "No Associate should suffer personal liability of frivolous, false, and whimsical disciplinary complaints." *Id.*

167.    The complaint quoted Utah Code for *stalking.*

168.    The Complaint was answered by **Amy Nally** who interviewed the Plaintiff by telephone, and could not provide any relief. She replied via email, "On 5/6/2023, 12:00 PM you raised concerns to our team. Amazon takes concerns of this nature very seriously and has a process in place to investigate. My role in this process was to be a fair and obejctive fact finder and to conduct and complete a thorough investigation. As part of this process, I spoke with relevant parties and reviewed relevant documentation…I completed a thorough investigation and did not find a violation of Amazon policy or standards of conduct." See Exhibit No. 26, on 6/13/2023.

169.    More precisely the events of the **Ninth Incident** were coincident, a complaint against "Intentional Mismanagement" was sent to **Kevin Sargeant** on 5/6/23, and was also transmitted to Human Resources team, **Josh Shelhammer** and **Katy Brown,** the Plaintiff met with **Kevin Sargeant** who, as the Senior most Leadership on-site could not resolve the complaint of mismanagement; it is plausible to the Plaintiff the Manager chose not to believe him in order to maintain a Status Quo.

### 11. ELEVENTH INCIDENT: DIRECT CIRCUMSTANCE OF RESIGNATION

170.    The 5/10/23 complaint was never responded to, and fell under the conclusions made after the **Tenth Incident,** the plaintiff contacted **Amy Nally** on a question for legal queries and Nally provided a service address for the Registered Agent, Corporation Service Company. See Exhibit No. 27.

171.    The plaintiff was on a Leave of Absence after the middle of June, had enrolled at the University of Utah, and on 7/11/23 dispatched a "NOTICE OF LEGAL INTENT" and also declared he did mail a copy of the Notice to the address provided by **Amy Nally.**

172.    The plaintiff reports thereafter; the e-mail was sent in-network via a Corporate Laptop and Security Token, still in the Plaintiff's possession, from off-site, that his Security Token was *revoked* at that point and no response was ever received. The document was sent to the entire "Under the Roof" ("UTR") management team, anyone on-site with whom the plaintiff had direct conversations or complaints. See Exhibit No. 28.

173.    The Human Resources and Management Team were attempting to have played a *war game* against the Plaintiff, and by leaving its *actions* undefined admitted their dialogue to be both intent upon *intrusive thinking,* and *bad faith* disciplinary context.

174.    The team had successfully constructed a *hostile* environment who could no longer reach out to, or recognize in the Plaintiff a site peer without summoning a spirit derision, their conflicts of interest were deliberate and had removed the Plaintiff from even professional contact.

175.    It is presumptive they took a vicarious triumph over the Plaintiff in the cause of Amazon's own policy that compares **Absolute Privilege,** who more or less nakedly had

stalked the plaintiff for a year and a half while the larger and more general mechanisms of Amazon.com and Leadership Principals and Policies failed, and were in fact used against the Plaintiff, who otherwise was respected by Amazon Associates for successful leadership strategies.

## 12. TWELFTH INCIDENCE

176.    Related to the **Third** and **Fourth Incidences,** the Plaintiff had applied to the Amazon.com, the company had opened the Amazon Technical Academy ("ATA") to Associates in good standing, an opportunity to gain paid admission to Professional Skills Training for Employment in Amazon.com, a paid certification course. See Exhibit No. 33.

177.    The ATA website on a July 1, 2025 story declared, "Amazon has upskilled over 700,000 employees globally through prepaid education and training programs." (Source: https://www.aboutamazon.com/news/workplace/amazon-employees-upskilling-education-training).

178.    The plaintiff applied, and was made aware during the interim period that if he was not in good standing, would not be considered eligible. The date of the Documented Coaching that held a narrative of *abusive behavior* was June 22, 2022, just 14 days before the ATA application would issue.

179.    The document was *false,* and whimsically postured *behavioral reports* to prevent the Plaintiff from even plausible succeeding at the ATA application.

180.    It is plausible to the plaintiff, the two managers engaged *conspiracy* under *retaliations* against the Plaintiff's Leadership ethics, delivered by **Devlen Bridges** and

37

**Adrian Caldera,** and approved by Human Resources to guarantee and pre-empt the Plaintiff would not gain Admission.

181.    The Plaintiff was denied admission, "After careful review of applications, we are unable to offer you admission to ATA's 2022 August cohort." *Id.*

182.    According to the Plaintiff, **Kerri Alger** at the in-person meeting related to those complaints attempted to explain how the ADAPT would not have been included on a disciplinary review for ATA qualification, however the language in the exhibit portrays an individual totally disaffected from the well-being of others, the individual *behavior* constitutes critical questions for whether a person can sit in a collegial environment, or be trusted within ordinary *workgroups.*

183.    **Devlen Bridges, Adrian Caldera,** and **Kerri Alger** may have tacitly agreed the Plaintiff was unfit for *peer status* on any ulterior basis, the apparence of complaint, etc.

184.    The persistent *appearance* of a *tortious interference* after the fact was *harassing* to the Plaintiff from June 2022 all the way into March 2023.

### 13. OTHER CIRCUMSTANCES

*Performance Reviews*

185.    Performance Reviews may have entirely suffered the setbacks initiated by Pablo Alvarez, and the Management Team may have engaged praxis beneath conditions of subornation, or finally embracing more plainly elements of conspiracy, duplicitous representation, improper overcompensation of bias; whether the Plaintiff's Performance Reviews were reported faithfully is a serious question on the depth of gross misconduct.

*Other Internal Amazon Investigations*

186.     "DUT7" on the other hand was under scrutiny *not* for weaknesses in production, its production scores were routinely high; instead, there was a string of Leadership violations, violations of no-fraternization and favoritism policies, circumstances unknown to the Plaintiff but took precedence under the rumor mill, the site saw at least five different site Mangers terminated for misconducts, and the Plaintiff was questioned by external site management on qualitative work conditions, well-being in general.

## VIII.    ARGUMENTS

187.     RELIEFS DUE FROM DEFENDANTS, a three-part argument binds them to the "At-Will" contract and does not limit the Plaintiff's Legal and Civil Rights to "At-Will" exclusivity because the Absolute Privilege was violated, withstood on the Plaintiff's independence and competence, and once subjected to complaint, left unremedied and even uninvestigated, so that the Plaintiff was divested inherent of both *success* and *experience,* and reasonably *resigned* than suffer a broken ethical legacy.

188.     Argument sounding in tort knows a three-part ligature qualifies *breach of contract* for *Constructive Termination/Coerced Resignation* conditions.

189.     (i) A *breach of contract* results when the "At-Will" employer fails *intentionally* and *negligently* to address real *violations* of *Behavioral Conduct* and *Integrity,* just as in Civil Society when *misbehaviors* result in violations of individual *civil integrity,* so that there is a *civil* and *criminal* victim, there is a dark boone within the *culture* for having harmed the victim, who is at least *person* for the purposes of *civil suit* under the Constitution of the United States of America.

190.    (ii) Actions at *Stalking, Harassment, Conspiracy* or *Collusion,* to render the *hostile* work environment even plausible demand the question of the meaning of the *statutory application* from the pleader, any action that was also *tortious interference* from any Employee, *negligent* or *intentionally negligent,* provoked the *civil violation* as provoked the *breach of contract.*

191.    (iii) *Vicarious infliction of harm* is elemental to *harassment,* any sufficient term, and the doctrine of Respondeat Superior is provoked where *discrimination* and *retaliation* are (a) observable, and at least (b) partially remediable; the Defendant failed to exercise diligence that would prevent other Amazon.com Employees from exercising **Absolute Privilege** to publish defamatory and insolvent statements about the Plaintiff.

## 1. BREACH OF CONTRACT, INTENTIONAL NEGLIGENCE

192.    The "At-Will" contract largely binds Employer and Worker to a mutual condition of contract solvency, all *workers* at Amazon.com are bound to an "At-Will" contract, sign a code of conduct, and must interpret Leadership Principals in order to successfully navigate the contours of right in the "At-Will" contract.

193.    "Employment at Amazon is not for any specified length of time, and both the associate and the company have the right to end the employment relationship at any time, with or without cause and with or without prior notice or warning. Only Amazon's general counsel and chief financial officer have authority to bind the company to policies or agreements that conflict with this policy of at-will employment. Any such exception must be in a written agreement signed by Amazon's general counsel or chief financial officer. See Exhibit No. 30, Page 8, "At Will Employment."

194.     (i) A *breach of contract* results when the "At-Will" employer fails *intentionally* and *negligently* to address real *violations* of *Behavioral Conduct* and *Integrity,* just as in Civil Society when *misbehaviors* result in violations of individual *civil integrity,* so that there is a *civil* and *criminal* victim, and there is a dark boone within the *culture* for having harmed the victim, who is at least *person* for the purposes of *civil suit* under the Constitution of the United States of America.

195.     Liability of Inferior Respondents, "Persons of Interest," may be due on Separate Action.

196.     Liability of the Superior Respondent, the *employer,* Amazon.com Services, Inc., "Amazon.com," is demonstrated.

### A. Violations of the Code of Conduct

197.     *Good Faith* in *employment contract* dealings limits and expresses the *culture* and *work environment,* so a *hostile* work environment results when *Good Faith* conditions are either *no longer evident,* or have suffered *significant infringement.*

198.     All Amazon.com *employees* sign an agreement to the *Code of Business Conduct and Ethics,* demanding "Compliance with Laws, Rules and Regulations," stated, "In performing their job duties, employees are expected to use their judgment to act, at all times and in all ways, in the best interests of Amazon.com." See Exhibit No. 32.

199.     "Discrimination and Harassment," stated, "Amazon.com…will not tolerate any illegal discrimination or harassment of any kind." *Id.*

200.     "Recordkeeping, Reporting, and Financial Integrity," stated, "Amazon.com's books, records, accounts and financial statements must be maintained in appropriate detail,

must properly reflect the Company's transactions and must conform both to applicable law and to the Company's system of internal controls." *Id.*

201.    And, "Employees should speak with anyone in their management chain or the Legal Department when they have a question about the application of the Code of Conduct or when in doubt about how to properly act in a particular situation...The Amazon.com Legal Department has developed and maintains reporting guidelines for employees who wish to report violations of the Code of Conduct." *Id.*

202.    And, "Amazon.com will not allow retaliation against an employee for reporting misconduct by other in good faith. Employees must cooperate in internal investigations of potential or alleged misconduct." *Id.*

203.    "Waivers of this Code of Conduct may be made only in a manner permitted by law." *Id.*

204.    Any *gross misconduct* may be identified on conditions of *civil stalking* and *harassment, civil conspiracy,* State Law, statutes under the Public Law, and because *unintentional* to *intentional harassment* occupies a sufficiently visible and workable ethical plane, any decision on the part of Amazon.com to maintain the implication of disfavor does admit *inferior* and *superior* breach of the Code of Conduct.

205.    If a *retaliation* was merely coincident, it did yet demand a cognizable remedy to have allowed the Plaintiff to have survived low-level Management prejudice; none of Human Resources investigations were capable to state factual limitations that would have pre-empted sincere pursuit of the truth.

206.    Where Management andor Human Resources may have *tolerated* disorganized *stalking* those individuals violated the Code of Conduct on at least three general clauses; and *vicarious harm* is implied under the term, "in the best interests of Amazon.com..." whereall the victim is instantly excluded from said *interests,* and implicates *gross misconduct* of understated *conflict of interest.*

207.    The Code of Conduct is interpreted to prevent a *hostile work environment* by setting a standard for *communication* that brings Amazonians together.

**B. Irreparable Damage to Integrity of Leadership**

208.    *Integrity in Leadership* maintains how *specific leadership principles* are observable and practicable in the workplace, so a *hostile* work environment results when *Integral* conditions become *impracticable.*

209.    The plaintiff was put in the position to have to repeatedly disagree with various members of the Management Team, and fell under Leadership Principle to have coped with it, "Have Backbone; Disagree and Commit," which states from the Amazon.com *Owner's Manual and Guide to Employment – Decemeber 2017,* "Leaders are obligated to respectfully challenge decisions when they disagree, even when doing so is uncomfortable or exhausting. Leaders have conviction and are tenacious. They do not compromise for the sake of social cohesion. Once a decision is determined, they commit wholly." See Exhibit No. 30, Pages 6-8.

210.    An "Open Door" policy was never appreciated related to the Plaintiff, and instead the operative "Open Door" was repeatedly applied against him, holding him to dysfunctional standard. *Id.*

211.    In any circumstance where a disagreement in the *expression* or actual *context* of some incidence was presented to be withstanding, the Plaintiff was postured so, this includes all seven of the Behavioral Documentations suffered by the Plaintiff, not a single one of those was entirely valid.

212.    In any circumstance where Human Resources either failed to restate the Complaint presented, failed to meet and demonstrate even an abstract of a burden of *diligence,* or failed to actually conduct a *significant investigation* and relate the *investigation* to the complaint, they abused a capacity for **Absolute Privilege** and failed to allow the Plaintiff the *authority* of his *disagreement* and instead relied upon the implied relationship the Management Team held with the Plaintiff for rational *solvency.*

213.    The Management Team and Human Resources Team crucially failed to tailor their disciplinary **Privilege** to Leadership Principles, they forced the Plaintiff to *double* and *triple down* on the "Have Backbone; Disagree and Commit" question, and compromised their own *convictions* as Amazon.com leaders, they compromised the perimeter of their own discretion and were never obligated to *substantiate* their ethics in light of the Plaintiff's statements; therefore, behavioral documentation never met a definition for constructive *coaching,* and critical disagreement were not monitored.

214.    The Plaintiff's obligation was therefore to have *reported* these infractions, and his decision *to delay* that report met direct *retaliation* and *punishment;* the Human Resources Team does not appear to have investigated **any numbered incident** in a manner that would grant *administrative relief* to the Plaintiff within the terms of the "At-Will" contract; while

several leads and an entire investigatory avenue were left unresolved, and the Plaintiff not

given sufficient confidence to preclude a question for *litigation.*

215.    The Justifications of Management were affirmed not with *fact* and with *substantial*

*investigation,* but with Deflections from the Human Resources Team, on understated and

unstated *policy expositions;* the exact cause for their *professional hostility* to the Plaintiff

has not been explained, whether they favored some other Amazon.com associates whom

they knew within the regional network, or whether they were racially motivated, or

culturally biased, or believed him to be corrupted or unnatural, are all unclear.

216.    The Management Team engaged *tortious interference* and thereby designed

*contract defamation* by deliberating on deformation and distortion of the inherent work

environment, and failing to protect it.

## 2. WORKPLACE STALKING, HARASSMENT, HOSTILE WORK ENVIRONMENT

217.    (ii) Actions at *Stalking, Harassment, Conspiracy* or *Collusion,* to render the *hostile*

work environment even plausible demand the question of the meaning of the *statutory*

*application* from the pleader, any action that was also *tortious interference* from any

Employee, *negligent* or *intentionally negligent,* provoked the *civil violation* as provoked

the *breach of contract.*

218.    In light of the argument described to be Breach of Contract, Ut. Code § 76-5-

105.5(2), "An actor commits stalking if the actor intentionally or knowingly (a) engages in

conduct directed at a specific individual and knows or should know that the course of

conduct would causes a reasonable person; (i) to fear for the individual's own safety or the

safety of a third individual; or (b) to suffer other emotional distress… Part (4), 'In a prosecution under this section, it is not a defense that the actor: (a) was not given notice that the course of conduct was unwanted; or (b) did not intend to cause the victim fear or other emotional distress.'"

219.     The Federal Public Law bears a comparable import, 18 U.S. § 2261A(1)(B), "Whoever causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in [§2261A] clause (i), (ii), or (iii) of subparagraph (A); or [(2)(B)] with the intent to [*harass* and *intimidate* another person] uses any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in [aforementioned clause (1)(A)].

220.     The Amazon.com network is inherently an *interstate commerce* system, who communicates Operational Information and logs it in real-time with off-site datacenters Seattle, WA; San Jose, CA; and Manassas, VA. (Source: Wikileaks.org/amazon-atlas/map/ pub.: Oct. 11, 2018. Alt. Source: datacentermap.com/c/amazon-aws/datacenters).

221.     There lacks sufficient *confidence* in Criminal Reports to State and Federal Officials on this matter, so that the *civil context* will bear the optimal precedence for any *findings of fact* where Federal and State Law are consistent; the *emotional distress* elements of arbitrary workplace *discrimination, negligencies* and *retaliations,* is properly restated from

State and Federal Law to define *workplace harassment* and *hostile working environment* conditions.

### 3. VICARIOUS INFLICTION OF EMOTIONAL DISTRESS, ARBITRARY DISCRIMINATION AND RETALIATIONS, DOCTRINE OF RESPONDEAT SUPERIOR

222.    (iii) *Vicarious infliction of harm* is elemental to *harassment,* any sufficient term, and the doctrine of Respondeat Superior is provoked where *discrimination* and *retaliation* are (a) observable, and at least (b) partially remediable; the Defendant failed to exercise diligence that would prevent other Amazon.com Employees from exercising **Absolute Privilege** to publish defamatory and insolvent statements about the Plaintiff.

223.    Because the standard of review is potentially capricious, we say the claim of *Intentional* to *Negligent misrepresentation* does not properly accrue until a *Retaliation* standard has been met, and until the *Negligence* standard can be shown to have failed Duty of *Good Faith and Fair Dealing,* against *reasonable* or *negotiable* demands, where failed, constituted *gross misconduct* showing elements of *gross defamation,* and *gross criminal stalking.*

224.    The implication of the Management Team was to import *vicarious* prejudice, on Amazon.com' own term of *Ownership,* "Leaders are owners. They think long term and don't sacrifice long-term value for short-term results. They act on behalf of the entire company, beyond just their own team. They never say 'that's not my job.'" See Exhibit No. 30, Page 7.

225.    *Negative ownership* characterizes *bad faith* practices who assert *adversity* and victory through domination, and does not characterize minute errors or growing pains.

226.    In context, it was perceived *retaliations* against Plaintiff *success stories,* and suppression of favorable *Performance Reports,* Improper disfavor against questions for *Management Recommendation, Intimidation* that discouraged fungibility of standing at Amazon.com to another similar employer post-resignation, up to and including the extant *legal dispute;* for whatever reason the Management Team summoned the core of its Leadership principles and construed an inverted rendition in the very action *to complain,* that in the view of the Plaintiff, should have resulted in *terminations* for *gross misconduct,* or a statement of *relief* from any subjective bias.

227.    The Management Team took offense at the Plaintiff successes and retaliated again and again.

228.    The intrinsic *Fraud claim,* that bearing the implication of both *tortious interference* and *contractual defamation,* may or may not be proven depending on the depth of *evidence* retained by Amazon.com related to the Plaintiff, Carlos Velasquez, AMAZON ID: "VELACA," so we say the *Employer* is obligated on *any dispute* who shows the even possibility of *breach of confidence,* a question of *Duty of Good Faith and Fair Dealing,* this for the same reason both retain some "At-Will" Legal Rights found in the several Employment Contracts, and so compare *Intentional* to *Negligent Misrepresentation,* "unless it is shown that the employer intended or directed the act which caused the emotional distress." *Tingey v. Midwest Office, Inc. et al.,* No. 1:2022cv00145 (D. Utah), cit. *Newsome v. McKesson Corp.,* 932 F.Supp. 1339, 1343 (D. Utah, 1996).

229.    The ethical culture terminated at "DUT7" appears to the Plaintiff and Victim to have been critically insular, and without sufficient transparency, and so finally bears the appearance of attempting to have provoked the Plaintiff *to retaliate,* and the Management Team's apparent perceptions conducted the inverse rendition of the Plaintiff, so that it was preferable to Human Resources to assert *status quo* and constructively *terminate* or *resign* the Plaintiff, who were so capricious as to have failed to *reach out* to the Plaintiff at any point they believed he was troubled, or at any point a reasonable person would assume his confidence in continued Employment was damaged unduly or improperly.

230.    Moreover, the Plaintiff extended two critical disagreements with the Management Applications, Exhibits related to the **First** and **Second Incidence,** on terms that were *severe* from the Management perspective and did not follow through because they could not *prove* the things they were saying.

231.    Given the entire *extended* Human Resources network took that unethical path and generated an inverse rendition of Amazon.com culture, provides the conclusion that Amazon.com *admits* vicarious prejudice on the basis of Site-Leadership Consensus, the *Absolute Privilege,* and bears the same *intentional neglect.*

232.    The qualified argument may constitute a *class basis* for litigation, as whether the Plaintiff was singled out, or whether the company entertains the disposition, whether its *disciplinary reporting standards* always risk the inherent *integrity* of the "At-Will" contract.

## IX. PLAINTIFFS FIRST CLAIM FOR RELIEF

233.     Any *dispositive motion* may cite argument and fines **per incidence,** this is not a

dispositive motion.

234.     The Plaintiff demands Amazon.com will pay to him the amount of $12,000,000 on

findings of *vicarious infliction of emotional distress* consistent with *statutory stalking* that

was ongoing from Late 2021 until the Plaintiff resigned in the Summer of 2023.

235.     After the corporate culture could no longer sustain the Plaintiff's *Integrity in

Leadership* he was compelled *to resign,* because (a) he been denied the merits of his efforts

and resource and would be forced to labor on under *false light,* and under an implied degree

of *disfavor* inconsistent with interpreting and succeeding under Amazon.com' "At-Will"

contract, while questions of *gross misconduct* were either *unsubstantiated* to bear criticism

or completely *exaggerated* to admit the Plaintiff should not have been such a subject, the

same question of *why* the culture became improperly *inured* to the Plaintiff's actual

statements and recollections, including his complaints, apparently collected across at least

a **dozen incidences** and affected **thousands of professional interactions** at the "DUT7"

distribution warehouse.

236.     Amazon.com in its Human Resources capacities failed to resolve two orders of

questions, questions on (a) Conduct in disciplinary issues, and questions on (b) Leadership

between circumstances of direct and critical disagreement evident from the original

documentation, so that it was understood the Plaintiff may continue "At-Will" maintaining

his perceptions of gross misconducts, showing precise questions of differences in

continuity, and having presented both verbal and written basis for investigation, timely or

no, the appropriate expectation for Leadership was that Amazon.com, by and through its Human Resources agency, should have evaluated *repetition* and *protraction* of the claim of *intentional mismanagement* for failures in the *sources of information*, and other low-level *failures in management communications*, such as *performance reports*, circumstances of *factual disagreement*, etc.

237.    Punitive Fine for *vicarious infliction* of *pain and suffering*, the Human Resources agency within DUT7 and the Amazon Pioneer Region construed those terms and conditions on a basis to compare **Absolute Privilege** without having developed longer, and more productive "coaching," either to isolate *actual misperceptions* between various subordinate Associates and Managers, or have critically moderated *serious disagreements*.

238.    Moreover, the vulnerability of the Plaintiff to a scheme *dispositive* to the Amazon.com Code of Conduct, and Leadership culture, communicated a gambit of *tortious interference* that compares *invasion of privilege* on *breach of contract;* who gambled the entire integrity of the individual Associate, i.e. the Plaintiff, to compare *interference* with his *personal agency*, to have meddled with his plausible *due promotion* and daily constructive *attributions*, confidence in departure for another company which suffered pre-emptive *retaliation* by **Adrian Caldera** on his departure, repeated suppressions from **Margarita Wayman**, managerial gripes from both **Devlen Bridges** and **Pablo Alvarez**, which could have been easily remedied with a strong conference designed to *relieve the management team* as related to "VELACA" from their *historical prejudices*, which otherwise would have followed the Plaintiff to have transferred to a different warehouse.

239.    The fact is, Amazon.com failed to maintain the discrete contours of its inherent *worker* contract, and once it was apparent the Management Team had more or less generated *consensus* to have obstructed or denied the Plaintiff the opportunity, to have disfavored him, the Human Resources agency in both the Pioneer Region and Seattle, WA were summoned not in genuine capacity, but in *bad faith,* they recognized it, and in an effort to prove themselves the stronger and the wiser, constructively terminated the associate by failing to meet the standard presented in his complaints.

240.    Alternatively stated, they refused to confer upon him the illiberal right of **Absolute Privilege,** engaged *conferential discrimination,* and maligned his *professional image* with the whole and repeated appearance of someone attempting to disabuse himself of an unstated grievance, did take *vicarious privilege* on-site, and did summon the *vicarious standing* of Amazon.com and its liberal to plausibly illiberal Human Resources agency.

## X. PLAINTIFFS SECOND CLAIM FOR RELIEF

241.    The plaintiff demands Amazon.com will pay him the amount of (a)$896000 on findings of tortious interference to have improperly interfered with and even denied promotion L3 Yard Marshall and Process Assistant to a career-level opportunity as Level 4-6 Operations Manager under an "At-Will" contract, where Performance Reviews standardized for such an evaluation and therefore expectation, a general assessment of a workable or favorable track record to promote within the company on a two-year to four-year, to ten-year time line and presuming an opportunity as high as Level 6: 2 Years at L4, for est. $58900/year; 4 years at L5 for est. $72300; 5-10 years at L6 for 105600, to find the above total.

242.     Amazon.com failed to secure the Plaintiff's "At-Will" contract right to be treated as an "Amazonian," while his peers took exceptions from the *Code of Conduct* and *Leadership Principal,* and were allowed by Human Resources to have successfully *interfered* with, *stalked* after, the Plaintiff's *opportunity* and *success.*

243.     These are Compensatory to Punitive conversions for *constructive termination* on conditions of a *hostile environment* defined on Amazon.com' own Code of Conduct, and Leadership program, all of which design contextual relief for disciplinary questions in the *workplace.*

244.     The sum total may be counted toward any *definite sum* defined in the Plaintiff's *first claim for relief,* the context for *tortious interference* follows conditions the *employer* is obligated to in *good faith.*

## XI. PLAINTIFFS THIRD CLAIM FOR RELIEF

245.     The plaintiff demands Amazon.com will pay him the amount of (b) of $53760 for missed retirement savings on findings of *tortious interference* to have improperly interfered with and even denied promotion from a plainly qualified L3 Yard Marshall and Process Assistant, interference with an "At-Will" contract, as based in a general assessment of a workable or favorable track record to promote within the company on a two-year to four-year, to ten-year time line and presuming an opportunity as high as Level 6.

246.     Amazon.com failed to secure the Plaintiff's "At-Will" contract right to be treated as an "Amazonian," while his peers took exceptions from the *Code of Conduct* and *Leadership Principal,* and were allowed by Human Resources to have successfully *interfered* with, *stalked* after, the Plaintiff's *opportunity* and *success.*

247.    Amazon's 401(k) offers a 50% match on the first 4% of base salary contributed by the employee (effective 2% employer contribution). Employee contributions are immediately vested; employer matches have a 3-year cliff vesting schedule. With 10 years of service, all matches are fully vested.

248.    The sum total may be counted toward any *definite sum* defined in the Plaintiff's *first claim for relief,* the context for *tortious interference* follows conditions the *employer* is obligated to in *good faith.*

## XII.    PLAINTIFF'S FOURTH CLAIM FOR RELIEF

249.    The plaintiff demands Amazon.com will pay him the amount of (c) $290400 for missed stock options on findings of *constructive termination* to deny promotion from a plainly qualified L3 Yard Marshall and Process Assistant, interference with an "At-Will" contract, as based in a general assessment of a workable or favorable track record to promote within the company on a two-year to four-year, to ten-year time line and presuming an opportunity as high as Level 6.

250.    Amazon.com failed to secure the Plaintiff's "At-Will" contract right to be treated as an "Amazonian," while his peers took exceptions from the *Code of Conduct* and *Leadership Principal,* and were allowed by Human Resources to have successfully *interfered* with, *stalked* after, the Plaintiff's *opportunity* and *success.*

251.    Amazon provides Restricted Stock Units ("RSU") rather than traditional stock options. The total represents the cumulative vested RSU value over 10 years, using annualized vested amounts per level (accounting for a backloaded vesting schedule across

overlapping grants from promotions). Actual vested value may depend on Amazon's stock price at a vesting date, which fluctuates; assuming no price in change from grant.

252.     The sum total may be counted toward any *definite sum* defined in the Plaintiff's *first claim for relief,* the context for *tortious interference* follows conditions the *employer* is obligated to in *good faith.*

### XIII.     FIFTH CLAIM FOR RELIEF

253.     The qualified argument especially where the Plaintiff had recently excelled, *or* where the Plaintiff's *Performance Ratings* suffered even *false representation* or the stressful effects of *retaliatory discrimination;* condition of *personal tort, tortious interference, vicarious harm* is consistent for private fines against individual **Persons of Interest** in a separate andor lateral action.

### XIV.     PRE-TRIAL REQUEST FOR DISCLOSUES

254.     Provided are a list of documents may resolve circumstancial questions more definitively, and evenly in the Plaintiff's favor.

#### 1.  Personally Important Documents

255.     Any and All Documented Coachings between 2021 and 2024.

256.     Any and All Records of Human Resources Investigations Submitted by the Plaintiff Carlos Velasquez, including assessments and conclusions, about "Velaca" between 2021 and 2024.

257.    Any and All Records of Human Resources Complaints and Investigations Submitted *against* the Plaintiff, Any and All Disciplinary Records, Carlos Velasquez, "Velaca."

258.    Any and All Performance Evaluations Resp. the Plaintiff, Carlos Velasquez, "Velaca" submitted by: Pablo Alvarez, Devlen Bridges, Paul Kondrat, Margarita Wayman.

### 2.  Site-Specific Documents

259.    Any and All Safety Documentation from July 2021 through July 2023, incl. Reports, "Roundtable" discussions, Investigations, any Safety paperwork related to "Velaca" or discussing "Velaca," held by DUT7 by the Safety Manager, by Amazon.com Services, Inc.

260.    Any and All Human Resources or Special Investigations Documentation that may bear import on site-wide investigations, Any Documentation that shows the state of the workplace culture.

### XV.    CLOSING

261.    Amazon.com has a maxim, "Work Hard, Have Fun, Make History."

262.    The meaning of *history* in site-specific terms amounts to efforts *to maintain* overall high site and regional *scoring;* the sites are evaluated every fifteen minutes by off-site *monitors* usually based in regional databases, or in Seattle, WA, and negative impacts to that scoring system prove not *flukes,* but instead identify the meaning of a work site's

history; Managers are uniquely positioned to take attribution from high-scoring sites, and from consistency in terms of improvement.

263.    The processes engaged by the Management Team, especially **Margarita Wayman** and **Adrian Caldera** related to the Plaintiff were beyond *retaliations* and knowing *constructive termination* ethics and strategies, complete misconceptions of the meaning of *history*, because it is a *worker* driven environment, the goal of Leadership is to motivate *workers*, and the Management Team repeatedly attacked the Plaintiff to prevent him from gaining sufficient ethical leverage that would have altered their preferred Management Style, and they are less diverse and in fact show themselves to be less competent to the challenges of *worker efficiency*, than to have literally stolen the *vested* opportunity at which the Plaintiff alone had demonstrated surpassing excellence.

264.    *Context* in terms of *Stalking*, the Persons of Interest fail to resolve larger *contextual questions* and prevail their disposition on withstandingness of *employement context* per se, the idea that it is a *good place* to work, good enough to tolerate *abuse*, and good enough to be without *the plaintiff*.

265.    For the above reasons we brought suit to guarantee the *rights of workers* who must meet routine *challenges* and overcome them in an *essential worker* economy consistent with Amazon LLC, and "Amazon.com," and other companies whose ethics have accelerated the *rights of workers* in the United States of America on the basis of *efficiency*.

266.    s/Carlos Velasquez, Carlos Velasquez

Digitally signed by Carlos Velasquez
Date: 2025.08.11 14:45:17 -06'00'

267.    Pro Se Plaintiff

268.    Civil Bureaucratic Federalist