Case: 2:25−cv−00674
Assigned To : Romero, Cecilia M.
Assign. Date : 8/12/2025
Description: Velasquez v. Amazon.com
Services Inc.

FILED US District Court-UT
AUG 12 '25 AM09:48

### PLAINTIFF'S UNSWORN AFFIDAVIT OF VICTIMHOOD

Pro Se Narrative Work for Background

and Cause of Action Against Amazon.com Services Inc.

1.  I first began work at Amazon LLC in Salt Lake City, UT in October 2018. I was hired

    10/31/2018 for Part-Time/Seasonal labor at an Amazon facility labeled "DUT1" wherein I

    was contracted to do any of several ordinary tasks in Amazon fulfillment.

2.  The building was a completely contiguous space excepting the Site Manager's Office

    which had a window and door, the Conference Room, the Lactation Room, the Ablution

    Room, and the Network Closet (a locked room with critical Internet Technology). The

    Human Resources agency was open-air, a set of tables near the cafeteria/breakroom and

    Management/Conference Offices.

3.  Actual delivery companies are Private Contractors who network through Amazon LLC.,

    and were positioned next to an indoor Maintenance and Materials cages, toward the center

    of the room and near the front.

4.  The front entrance is located on the North side of the building, and is electronically locked

    through a security system, and along the sides of the building are about forty east and west

    facing terminals for loading and unloading of delivery trucks, the dock is at the south side.

    The building is less than 1000 meters in length with about 1.5 foot thick concrete walls,

    and the ceilings are about 125 feet high.

5.  People walking into the building will notice several high pilons, jointed pilons for

    earthquake and wind resistance, and vertical pilons. There are high electric ceiling fans

    about thirty-feet in diameter positioned on the ceiling, and also high gas furnances. A 40-

    feet high roll of insulation is wrapped around the entire interior of the building so that the

1

interior appears white-colored, and unexposed. The building appears as a single bright column when standing anywhere within it, the floors are concrete and have a lustre, reflect light and form.

6. Most of the building is filled with a conveyance systems with its headwaters at the dock, and filters North toward the Entrance.

7. Some background on the work, and the work-site: "DUT1" was a self-contained and original Amazon LLC warehouse at 2291 COMMERCE CENTER DR STE 400. in Salt Lake City UT, 84104. The site was a ground-lease, and was described to me by one supervisor there as an older "iron-sides" type site. Meaning it had been installed in an ad-hoc manner on a ground-lease, and could operate at any scale and be modified to meet demand, but was not designed *for* AMAZON.

8. "DUT" is a common abbreviation for Amazon distributions facilities in the Utah valleys; "DUT1" was effectively the *first* general distribution center owned and operated by Amazon LLC for deliveries from its internet front end, "Amazon.com."

9. I obtained my first promotion in 2019 from Part-Time/Seasonal to Fulltime in Winter-Spring 2019.

10. At Amazon LLC the labor Associate obtains a "Blue Badge" for building access and may discard a "White Badge" which at the time only had a blue border with a white interior, a picture of the Associate, the Associate's corporate alias, and the Associate's actual full name.

11. I submitted to the company a limited complaint over Associate rights to gain Full-Time employment before the opportunity was announced, and received the Blue Badge with the first batch of hires from the Holiday Season.

12. I worked Nights, originally from 6PM to 10PM, and then the worksite transitioned to Full-Time 40+ hour weeks.

13. At the time of my initial employment I was not very invested in the work-site. I was instead working to fund a Pro Se civil litigation in Federal Court.

14. The work-place culture was more hidden from view; as a part-time Associates I did not have any technical details for daily work, and did not have any important interaction with leadership. Instead, I felt it simply had a virtuous intent.

15. The management culture in that period was different as well; it was actually a different *era*: an era of Second-class status for entry-level people. Amazon managers at the time on hire/promotion were vested stock options, and "Blue Badge" matriculations were granted a privilege for Benefits; it was maybe a vestigial of dot-com culture. It was only after the COVID-19 crisis that benefits became mandatory for Part-Time associates.

16. People came and went, and I stuck around largely because the civil litigation I had filed kept running into political snags; *Fraud on the court*, Federal Rule of Civil Procedure 60(d) provides sections (1) and (3) grant relief for some kind of *fraud* in the court's transaction. Such a civil question largely amounts to a Perjury (18 U.S. § 1623) quest, and evaluating results of a patently False Declaration (18 U.S. § 1001) in the written transaction. The

*constitutional* object of it is to prevent Federal officers from treating the U.S. Court system like a Parliament.[1]

17. The rule is meant to protect the civil rights of pleaders with any efficient standing, and may really be designed to correct and punish any kind of Bad Behavior. It is not really in practice in the United States of America, we think because there is ambiguity in politics of Authority under the Constitution, so many people have a living conviction there are not "Guarantees" to our "Social Contract."

18. The case was suffered repeated criminal delays and so I took the Full-Time position, and worked into 2019 and 2020.

19. I did not build a critical savings plan, or 401k option because I expected my legal case would be resolved in my favor, the object was pretty well-defined. And even if, in the unlikely event of it, I was unsuccessful, the matter would be resolved so efficiently that I would not be in suspense.

---

[1] Three cases involved in this unresolved question, District of Utah Case Nos. 2:18-cv-00728; 2:21-cv-533; 2:23-cv-00133; Judges Nuffer, Benson, Nielson, and Bennet. This is a matter of major concern where *fraud on the court* is a realized problem for the victim; the Federal Officers committing crimes against the plaintiff will hypersensitize this proceeding where these new Defendant parties, whom will have shown a criminal allegation against, will learn of their opportunity to conspire to commit a further to compare improper influence. In essence, the more *standing* I can show, the greater the political threat I can be to any of the Defendant parties.

20. My original goal was to transfer to the University of Utah. I was already older then, about Thirty-Five years old. Two years before I had been in published the Salt Lake Community College in their literary magazine and so things were looking up Academically, while I basically had too many delays completing school otherwise.

21. I ran into legal troubles which precipitated the legal action discussed above. The end result was that instead of transferring to the state University from the city college and working, I was caught up in working and being the victim of Political Fraud which I could not discuss with anybody at work, because the work place policy does not appreciate political context.[2] Generally, at each wrongful disposition I found *confidence* in the work place was attacked, and I still feel these repeated offenses from within AMAZON LLC were precipitated by constitutional *breach of confidence* in these several U.S. Courts venues; *confidence* and *confidentiality* are not always different things *within the same forum*, and instead are intended to be toward uniform where *discretion* is paramount.

22. But Judicial Malpractice is *unheard of* outside what I imagine are very close legal circles, and the personal disposition sensitized and impacted my workplace plans. Suddenly my temporary confidence was deflated and I was instantly vulnerable to criticism and social distancing. My plans for a 90-180 day stint as "Stower" at AMAZON LLC were instantly covered by a Fog of War based in the months-long deliberation over the Political Fraud committed against me.

---

[2] Amazon holds Code of Conduct, Leadership Tenets, and Human Resources Practices to define a constructive workplace culture, "Work Hard, Have Fun, Make History!"

23. Those Months became years, and my financial insecurity led me to take promotions. I simply did not want to stagnate after more than a year of being an Amazon associate, while I proceeded through appeals cycles, time after time, finding my own real arguments and positions vindicated in all the settled law of the nation, while the Judiciary lied and secretly asserted some form of incompetence. I had no actual reason to take a different course of action.

24. Many people have a "non-political" policy for certain kinds of discussions, sometimes U.S. Courts are those kinds forums. But in actuality it is a factor to consider as *why* so many people discriminated against me the way they did; disfavor of political discussion usually has a roundabout *punitive* and/or *discriminatory* bent because of the historical influence of *contract law* over legalism in general. So I always felt that talking about "Pro Se Petitioning" would result in disfavor and discrimination; plus, it has often been good advice NOT to talk about pending litigation.

25. I can recall violating the rule at Amazon LLC only a handful of times, usually with Associates I was friendly with who did not make any complaint. In one instance I accused a Second Amendment advocate of "raping the constitution;" the second amendment is not plainly a constitutional restatement than is a conferential interposition, and is sometimes treated as implied right to breach the constitution of the country. The Federalist will already see that as *breach of confidence* in terms of meritocratic entitlement; the U.S. constitution does not advocate *strict remedialism*, where we presume that *civil rights* must be *prescribed* in all their capacities in order to sustain *textualist* methodology.

26. In any event, I was gainfully employed there without much change in my work process all the way until the start of the Pandemic in 2020. I had recognized I was going to be in for awhile at Amazon LLC, and that I had better take a promotion given how significant the delay had become—so I applied for an Ambassador role, was first denied it, and then it was handed to me after the previous site Ambassador had made some critical error and had the status revoked.

27. I took it up and operated mostly to attempt to be helpful, and encountered all kinds of different political attitudes about work. Some people are loyal to particular leadership, or cliques, and refuse to take instructions and only will assist. Others would participate directly in meeting leadership oriented goals, some attempt to be physically or verbally intimidating, while others are invested attitudes and terms like "Emotional Intelligence" and "Cooperation." It simply seems to depend on where a person is at in his or her life.

28. The Ambassador role in that time had three major parameters: (1) COVID-19 Testing, and (2) "Stow Master" and low-level Supervisory process; (3) New Hire Training.

29. The work process was then called "Sortation," is a technical term in delivery logistics which defines sorting out usually thousands of shipments by delivery region prior to loading delivery vehicles. The work-site would process for eight-hours shipments that were scheduled for the delivery *per diem*.

30. The remaining two-hours were devoted to "Pick and Stage" wherein closed vinyl sortation bags were *picked* and placed into specific delivery manifests by computer, and *staged* at an appropriated zone for pickup by an Amazon LLC contracted delivery driver.

31. Operations at the time were divided into Categories, with two different schedules; (1) Under the Roof ("UTR") Sortation, and (2) On the Road ("OTR") Outbound-Delivery. Respectively, *last-mile* and *final-mile* logistics. The Sortation process was comprised of an early AM shift starting just before Midnight, and a second Morning shift beginning about 6AM, while the OTR shift began around 7-8AM to oversee Departures after Staging.

32. At "DUT1" COVID-19 testing began after the Sortation process. So instead of doing Staging ("Pick and Stage"), I would wait under Amazon's COVID-19 procedures at a table with Swab Testing kits. My duties were as follows: (1) PPE Gear required, Facemask, Gown, Gloves; (2) Contact off-site Medical Assistant to Conduct actual Testing; (3) Packaging Completed Testing Kits for weekly shipments.

33. As "Stow Master" my task was to assist stowers from the Ambassador role. Sometimes this involved alerting individuals to areas that needed work, and other times it involved organizing strategies and working with a willing Associate; I felt that I earned my promotions developing strategy to keep us ahead of routine delays in stowing.

34. As an Ambassador I developed a methodology for addressing recurrent intra-process to end-process delays; I called it "Macro Stow" and usually had to implement it myself because there was not a supervisory chain of command available to implement more discretely. The system amounted to conducting Sortation at a strategic pace to streamline personal efficiency and maximize group efficiency, stowing small parts of everyone's section to reduce burdens which contributed to dark, unsafe, and overfilled Sortation racks.

35. Amazon associates have an interesting habit of slowing down their work pace once the actual work aisle becomes *darkened* with unstowed shipments. Aisles are about a meter

8

wide, and 50 feet long, most associates will work 2 to 5 aisles in a shift, and stow 200 to 500 shipments in an hour.

36.

37. The other supervisory process was to train New Hires; when new hire training was being conducted, during the pandemic, we observed *mandatory* social distancing practices and utilized a Tour Guide intercom system to describe Best Practices and field questions that were extant from training videos.

38. In December of 2020 I became aware that there were promotion opportunities, and linked up with my then L4 Manager, Eric Turner, who advised there were multiple opportunities at new sites scheduled to open in 2021.

39. I put in an application and did not hear anything for a significant period of time.

40. In spring it became common knowledge to most associates the capacity of the site was being split between three new warehouses, "DUT3," "DUT4," and "DUT7." So I began to reach out to people I was advised were reviewing the hiring process.

41. Amazon LLC for T1 Associates has a three-stage promotion process; (1) Application screening, (2) Interview for Incline Status, (3) Selection. Higher level positions may have multiple interviews, as is common in most industries. I did not have difficulty receiving a recommendation; and did moderate preparatory work with another Manager prior to the interview.

42. Just two weeks before the move was scheduled I was hired as L3 Yard Marshal for Amazon DUT7. I underwent two weeks of training at Amazon DUT3 with another individual who

gained the same promotion, with whom I would subsequently work at DUT7. I was trained by one associate with whom I was already familiar, and another who was new to me.

43. The training process was a little bit vague, but the documentation was sufficient. The most important piece of information I was given *relevant to the suit:* the Yard Marshall's task to receive and unload trailers is by default *uninterrupted task* meaning the Yard Marshall operates *more independently* from the Sortation and Pick and Stage Process, it is a *specialized role.*

44. The Yard Marshall was "UTR" role to maintain Operational relay of truck drivers and trailers between delivery stations, sortation centers, and fulfillment centers; delays at any Delivery Station or Fulfillment Center could delay the entire regional network where drivers were typically pre-assigned a schedule. (DOCUMENT REQUEST: YARD MARSHAL TRAINING MATERIALS FOR AMAZON LLC DELIVERY STATIONS IN UTAH, 2020 THROUGH 2022)

45. Additionally, The Yard Marshall was responsible to communicate Status Updates to the UTR Management team (Arrival times, delays, on-site issues.), conduct intranetwork escalations using different APPs, to reach out via telephone to drivers and managers and supervisory Associates off-site to relay Intelligence and advise the operation in light of the most relevant data; most commonly this meant asking the Fulfillment Center ("FC") to assign a driver to a linehaul that was delayed, advising delivery times, and plotting "Trailer Dock and Release."

46. Other low level duties included; breaking trailer seals, completing standard Trailer Dock and Release ("TDR") mechanisms, investigating trailers for damage, investigating the

"Yard" for safety discrepancies, safety cleanup and organization, investigating bad loading practices from the FC, directing other Associates to assist Standard Work tasks related to the Yard Marshall.

47.

48. The role was a minor adjustment; it was not the role I had originally applied for. I knew how to solve operational problems in sortation centers related to Associate groups who Stow.

49. In my first week, one of the Defendants aggressively chided me for organizing my workspace while my task unloading was completed, but the team never really took steps to include the Yard Marshal in operational discussions in those days, it was a bad habit of theirs carried over from DUT3 and DUT7.

50. This was an important point: The individual who "chided" me was Def. Margarita Wayman, and she projected on my behavior at that moment her own prejudices and in a manner to offend, and create social and disciplinary distance without cause or warrant. She mistook me for someone who was taking it easy in an effort to instill a sense of disciplinary disfavor against her peers, and against me.

51. The other major observation to point out the narrative; the team at DUT7 was composed of leadership, Supervisors and Managers, from DUT1 and DUT3. Most with about as much tenure in the company as myself, a difference of about one year being the greatest. The job is largely composed a separate rationale for Standard Work, and spends a significant hours of the work shift inside of a trailer. It is also more physically demanding, in general.

52. The implicit question at the time: who among all of the new L3 transfers would be the first to take a management role. The question was subtle and was intended to be a quest for competence, and I think was debated from time to time in closed conversations, and made out into Action and Theatrics. Like most jobs, the question of *who* promotes and *when* is very tangible; I can remember even when I was not seeking a promotion, when I deferred Ambassador applications and other L3 spots, how pronounced the disposition of the promotion was, it was always palpable; I was always encouraged to congratulate someone even if I was not close with him or her.

53. My experience as a L1 associate had given me insight into how to make a very streamlined process for Yard Marshal, but I found the staff was unwilling to work with me directly. That is, the Delivery Stations have a traditional role called the "Waterspider" (the name indicates *trailer awareness,* puddles, chemical spills, and deadly spiders) we usually kept 1-3 on any night, and the experience level of some of the Ambassadors who did the role consistently made them confident to reject my experiments.

54. I spoke to the Process Assistants who were governing the process then, Whitney Richenbach and Dalton Hanks, the first actively argued with me against my suggestions, and the second invented an excuse not to hear it. Later, the corporate entity of Amazon LLC would compel us to adopt a similar practice, as the one I had then suggested; one major challenge teams of associates often face at high rates of production was emptied go cart congestion, and I often observed behaviors which I thought were objectionable, where the more tenured associates would task a new associate with loading empty carts into trailers, and would fail to accompany those individuals through that process they would

thereby attempt to eliminate them from a competitive plane and at the same time would introduce delays into the work cycle.

55. My plan was to have Waterspiders *work together* more; I would have tasked them distinct sides, so that the more experienced associate could always aid the less experienced one in reloading the trailer with empty carts. It was an absolutely critical process which the Yard Marshal role otherwise had to take care over.

56. Instead, the DUT3 culture was invested in ethics of *promissory vestiture;* this meant attempting to allow tenured associates, ideally because their efficiency was high, more independence generally. It's actually a common strategy, but again as stated above, created favoritism, cliques, and longer periods of inefficiency wherein the Ambassador did not really invest in a new associate's training for what appeared to be capricious reasoning.

57. The Supervisor, the Process Assistant, there were two with whom I worked a lot, Melissa Murano, and J (First Name initial) , under Defendant Pablo Alvarez, operated as upon Management track, often attempting to do as little as possible physically in anticipation of promotion and demonstration of their experience and authority, even against the dignity of their peers whom they may have perceived to be in competition. (This meant that I worked much harder than they did.)

58. One wore extremely long nails, and could be seen to remain stationary at a desk for long periods of time. While the other was more chatty, and would show hesitance to do physical labor unless it was mandatory *business need*, such as filling in for someone using the restroom.

59. The workplace culture was actually cultivated to operate that way by individual managers, to design individual vestiture, while the Standard Work processes remained the same. It was a low-level corruption scheme, which operated a capacitive *screen* against poor work ethics, and a social screen, against people who were socially undesirable. Again, it's a common behavioral trait in work places, and Amazon defines it as "Ownership," a leadership value based in a liberal terminology of *proximity*, asserted by most competent people; the word "Ownership" is literally painted on the Human Resources wall.

60. But I was left with the feeling they thought it would reduce them, and as it turns out they may have a very negative and false perception of my conduct as based in ethical differences of Leadership.

61. I would witness them playing *War and Peace* with the Inducting stations, and trying to inflate themselves on the work in general, sometimes socializing a lot, while the new guy was nearly suffocating in a darkened trailer full of carts; we always found solutions so I did not think it was a systemic problem, just elements of *competition* which were sometimes bad for work-related communication. I felt naturally discriminated against looking for constructive solutions.

62. Eventually, AMAZON LLC imported a comparable process to us from European sites to solve the exact problem, and the fact is that the solution in place at the time I resigned was still vulnerable to the same problems of *favoritism,* and deliberate *attrition* strategies, which were used to *disfavor* associates who were not part of a convenient workgroup.

63. The way the Sortation shift works; the crew is divided between the Stow floor, with all of its shelving and vinyl bags, and the Dock area, with the trailer doors and loaded go-carts,

cardboard bins, and wrapped pallets. Both sides of the associate base interact with a lengthy electric conveyance, and observe more or less uniform standard work practices respecting the customers' shipments and operational integrity of the conveyance.

64. The Dock crew is smaller than the Stow group and is usually more experienced; the shift begins with the Dock Team cutting open cardboard bins ("Gaylords" and later, "Shuttles"), opening doors on go-carts and unloading those contents onto a narrow conveyance "finger" where a designated "Inductor" used a gavel-like infrared scanner/printer to *receive*, and *label* the package so that associates along the conveyance route will direct into the appropriate sort cluster-location, Labeled A, B, C, D, E, G, H, J, K, M, P by pushing them down a slide onto a regional sortation cluster conveyance. (I was advised at the start of my work by Paul Kondrat, then Site manager (L8) as Yard Marshal the site could handle as much as 250k *per diem*).

65. Facially, there were only minor disciplinary problems; one new associate would leave pallets haphazardly and would react aggressively when corrected, an Associate would assert his own independence to risk disposition my authority. These were minor, self-resolving events.

66. Later, I would have associates intentionally *delay* production, or *refuse* to do other roles and tasks, and who would attract the animus the Operations Manager against me, primarily for theatrics since we could not really alter our daily process without impacting production. Again, I would let it roll off my back primarily because the delays they imposed were usually minute, and they themselves were experimenting, like intelligent people do, with reasonable and effective control over the leadership and workplace process. Where they

became persistent, the only solutions were (a) replace and individual; (b) swap individuals who were delaying by socializing; (c) demand people to meet a Standard of work.

67. *Leading* people, and *working with* people are sometimes two different tasks, depending on how much authority any individual is attempting to exert. What I really found was that *Emotional Intelligence* was more dynamic, was more capable to aid people who actually needed or wanted help, and was only a little bit disfavorable to people who were more likely to misbehave. But it was precisely on those terms that a first critical misconduct precipitated.

68. Their tangible conspiracy became perpetual; these claims are predicated on two major considerations:

   a. I overcome the obstacles presented;

   b. The Human Resources agent did not protect me from deliberate mismanagement where I had overcome obstacles.

69. I understood it was even possible associates on-site had participated in schemes at DUT3 to ouster higher level managers to favor particular lower-level managers at promotion, and supervisors at the same vertical scale. They may have accomplished it by deliberately creating *safety* problems, and *reporting* them. This is something an individual would have to investigate surrounding resignation of upper site-management at DUT3 between 2018 and 2021. I at least thought I had heard some aside from Def. Alvarez on the subject.

70. The workplace conspiracy first started; the Waterspider who I had approached regarding this other policy (First Name: Felipe) had rejected it pretty critically, subsequent to that I received a reciprocal complaint from Dalton Hanks, I was speaking with him about whether

76. Def. Alvarez had complained to me how Managers at his level were not allowed to make direct hiring decisions, complained of having more or less groomed individuals and then having no greater power under Amazon hiring practices, and had lamented the excessive and unforeseeable favor placed upon "College Hires," individuals who sometimes take precedence at *promotions:* he communicated a desire for excessive power, and Attributed that management structuring decision to the corporate policy forbidding *Favoritism.* I knew how hard I had worked at DUT1, and knew the ins and outs of the process better than anyone else on my team, so at the time I did not think it was a vindictive or conspicuous statement.

77. I was affirmative. Originally, I thought maybe it would be better to keep the same role and further perfect it. Maybe someone deserving in the L1 ranks would appreciate it. I could see how at least one of the Ambassadors really wanted the job, and how some of the Process Assistants had groomed him for the role. He was often allowed to stand and "Own" the PA's computer, would direct other associates sometimes aggressively, and was a favorite of the Manager.

78. I think it is possible Def. Alvarez acted retributively in the cause of his *favored* Ambassador.

79. Beyond that, my legal circumstances were showing promise of more extended and criminal delays, and I knew judging by everyone's behavior, how *possessive* they were over the Supervisor and Supervisory capacity, that getting in line for a Level 4 Manager promotion was a smart idea. The legal case that was pendant in 2021 did not resolve the questions that were presented, and ultimately precipitated a lawsuit against several Judges in this same

court, and in the Court of Appeals. That matter has now extended into more overtime, and is in process adjacent to this matter. **Both complaints advise the jurist.**

80. So Defendant Alvarez apparently *also* must have thought that Eric Turner was stepping on his toes when *I* was leant the opportunity for the PA role at preference; Eric Turner was an L5 at the time, while the Defendant was an L4.

81. Other Defendant managers, Devlen Bridges (L4) and Adrian Caldera (L6) disclosed this to me much later, on occasion of a SECOND MAJOR INCIDENCE by them, that a SAFETY Roundtable meeting had a group of Associates complain that I was somehow improper and/or highly angry at one or more individuals. It obviously was not a substantive statement, and I can remember one such incidence where, in my inexperience, I had attempted to holler to someone under the noise of the environment, and my voice went off-pitch and sounded like a an inappropriate and hoarse command.

---> DOCUMENTS REQUEST

82. The same Ambassador at the center of this discourse had heard me, and then disregarded the statement apparently for the tone of my voice. I addressed him later about it, to be sure that it was not taken too offensively, and he explained that he had simply been too busy to have understood my request.

83. I was gaining experience and attempting to conduct several things at once and had found a minor delay in my process, which only the "Waterspider"/Ambassador was positioned to react to.

84. In retrospect, the ambassador may have reported that incident capriciously, in a manner to goad management into taking wrongful action on his behalf. The Safety and Management *never* timely reported that to me, instead they withheld like an inside-joke, and waited for a shoe to drop.

FIRST INCIDENCE

85. The first allegation of real *fraud* in work place practices took place right as I was concluding my time as the Yard Marshal; I was in a position as the Yard Marshal and we ramping up production in the 2021 holiday "PEAK Season," this involves Mandatory overtime days for everyone (6 Days a week, with lots of extra pay), lots of new faces, and importantly lots of people doing *progression* in terms of the Standard Work practice, it becomes fun and competitive.

86. As a result, we had some days with too much material coming off of the trailers at any given point, the Waterspiders would move quickly and in one instance nearly struck someone with a cart. Shipping carts weigh 200 to 400 lbs. when loaded, are guided on wheels with breaking systems.

87. The incident culminated the following day with Def. Alvarez asking me to being extra-cautious at Unloading the trailer, with the proviso that he may at any time that it looks too crowded on the dock, call a cessation to carts-unloading. This was fine by me, and I went from the start of the shift to the handoff from the Yard Marshal who was on-duty there during the early evenings Def. Kaj Gibson.

88. So the shift went fine, and naturally our available dock space filled up so that my unloading practice had to slow. Finally, after I found that we did not have enough walk space for the

Waterspider (Def. David O., a late L3 promote) to haul cardboard, we had to walk a very narrow path between the tail end of carts staging, and the loading dock platforms, I received a verbal message to discontinue unloading from Def. Alvarez.

89. At the time, there were three to four open spaces available at any moment when usually there are twenty or more. So I took a break from unloading and updated trailer information, and then proceeded assisting other associates with their tasks. These are subordinate elements to Yard Marshal standard work. The *drive* for a Yard Marshal during the Peak season should have two major priorities; (1) Safety of Associates; (2) Unloading and releasing empty trailers.

90. Both principles are day to day priorities; during Peak season, the timeliness of trailer unloading is helpful to drivers who may have to queue at the Fulfillment Centers, this was at least my understanding at the time from information that came to me from other Yard Marshals, this was the essential character of the *uninterrupted task*. That is, Operations Management in UTR platforms did not often advise amendments to any standard practice for specific or memorable reasons, and could not really demand a permanent cessation of Standard Work practices in light of the potential network-wide delays. In short, Operations Managers are only narrowly authorized, and would have to conduct broad networking to have adjusted such a circumstance.

91. On that day, I found after about ten to fifteen minutes of delayed *unloading*, that there was room to continue unloading the trailer. So I radioed Def. Alvarez more or less for permission because he had been fairly clear that he wanted to monitor the situation. But at

21

the time that I radioed him, he did not reply. I radioed him repeatedly and he did not comply, or was detained otherwise.

92. I asked the Process Assistant if she knew where he was, and she could not advise (Melissa Murano). I explained the situation and she was reticent to offer any advice or input whatsoever. So I stalled for several minutes and continued assisting other standard work processes while attempting to reach Def. Alvarez sporadically.

93. Finally, remembering my training, and seeing more and more space opening up on the staging floor, that my role was an *uninterrupted process* I proceeded to unload more carts in order to guarantee timely release of trailers, and careful not to rush the process and so not imperil someone's safety.

94. Def. Alvarez returned and stated that he did not want to continue unloading trailers at the time, stating that I had violated his direct instruction. I explained the standard work process, and the manner in which I had been proceeding, the extra care taken over the *uninterrupted task,* which he seemed to appreciate but was emphatic as if I had actually put someone in harm's way. But he continued to assert his decision in the first place, and ignored my statements against his radio silence; in retrospect, I would say he had created a *false narrative* of me, as a "Yard Marshal" having become detached from a "Safety first" priority, and also from L1 and other L3 associates, more or less having implicated I had an attitude problem.

95. That last element is at the origin of *abuse of discretion;* SAFETY policy is intended to be observed strictly, so it can be confusing when we are *attempting* to be safe versus when we think *are* being safe. Def. Alvarez discretion over the unloading practice could have been

22

properly advised based in statement or parameter of *trust* (AMZL "Earn Trust") in my Standard Work Process, in lieu of directly correcting any claimed breach of safety policy, and did not account for his own absence.

96. This took place an additional two times, according to his report; I can remember being asked to discontinue loading via radio, and I can also recall three different instances where Def. Alvarez was either (1) Not in radio communication, or (2) *vague* about his instruction. That is, it was not ever clear that his instruction would override any Standard Work Process, nor did his team actively and effectively communicate such an understanding.

97. I did communicate with our L4 Safety Manager to maintain an above board approach, on a third decision *to continue* while the Def. Alvarez was again *not available* on radio communication. Later, when I would defend my actions directly to the Defendant, he would ignore the opportunity to have consulted with Safety; it was an improperly postured rule.

98. I felt empowered and relied upon to make that call myself each time based in the observable work space.

99. It was not that same day, but not long after it, I received *written warning* called an "ADAPT" based on those incidences, and also based on incidences of my not having taken lunches for several weeks. The language of the ADAPT held an implied term of insubordination and made a full declaration of incompetence bearing the implication of Management authority.

100.     I verbally contested the ADAPT. In retrospect, it is clear that Def. Alvarez was conducting a form *entrapment,* his continuous radio silence, and his refusal to hear my reasonable objections, plus the anonymous reporting of my conduct as insubordinate, all

of it communicated a team dissatisfied with my person on a basis that would equitably compare intolerance for Diverse work ethics and management styles.

101.        The team would build a long-term platform for defamation.

102.        I spoke first to Def. Alvarez objecting that he had been repeatedly absent; he discarded that claim on the condition that *his instruction* had been clear. I countered that he had been out of radio communication, and that it was *uninterrupted process.* Again he ignored that position, and took point in the argument on his own terms.

103.        I spoke next to Jonathan Cowan, our Human Resources officer there (since resigned in 2022), and asked if a misleading representation of incidence would not be *fraud.* The cause at the issue was vague, was *reasonably interpretable* from my perspective, and I was not actually violating company policy. Def. Cowan eschewed the question without addressing it, "No. It's not."

104.        I persisted and he began to degrade the constructive quality of my question to generalizing about leadership character. I carried the same discussion with Def. Cowan back to Def. Alvarez and attempted to convince that they were in error over the safety issue, and that it had to be amended for me to agree to the ADAPT.

105.        At that point, Def. Caldera who was passing by engaged the conversation. The three of them together *disregarded* my objections without any constructive input, literally ignoring my objection about the logistics and semantics of knowing when cart placement is or is not safe, ignored elements regarding the manger's absence, and ignored *training oriented* discussion about Standard Work processes, literally coercing the impression of my cognitive incompetence three versus one.

24

106.    Def. Alvarez literally attacked my memory of the incidence by rendering his own positions relevant to mine *vague*, while Defs. Caldera and Cowan both leant him the full weight of their consensus without consideration for the measure or the effect, interrupting me with semantic questions and disregarding stuff I thought was relevant.

107.    Altogether, the three reinforced a complex fraud practice where I was (A) the subject of false declaration in a disciplinary report, and (B) where the team had no basis for real interest in the same discussion which involved essentially (1) communications availability for critical issues, (2) continuity on Standard Work Processes. Essentially, what to do when the manager gives you a special instruction, and then is out of communication for much longer than expected.

108.    It is plausible they expected me to communicate with Eric Turner, but he was nowhere in sight. Additionally, the ADAPT had included an incidence of me *working through lunch*, which is forbidden, and we held no constructive conversation on that point related to the ADAPT. They were using the entire circumstance to harm and humiliate me with false impunity.

109.    Any discussion which could have clarified a *cause* for what was interpreted to be *my error* was completely destroyed. Even discussion about missing lunches, which I think went on for several weeks, was never broached.

110.

111.    A brief explanation: I was experiencing delays completing Yard Marshal records-keeping and trash disposal before the start of the Pick and Stage process; additionally, I

was usually working *through* the standard lunch-time, so one part of the shift would lead into the next. I would get a radio call to appear by 9AM at the Launchpad.

112.     At the time management appears to have become aware of it, I was just mastering timeliness in the process.

113.     On the ADAPT I declined to AGREE, and made some very short statement about how the facts of the ADAPT were not wholesome. Clarifying, the statement was entered for me by another manager, Devlen Bridges who did so at my verbal consent, while I looked at the stuff he had written.

114.     When I left Amazon LLC, the above ADAPT had deprecated from my record, and the Human Resources agent the time,   [ First Name ?] Brown, stated she could not easily get ahold of it. It is possible she was lying at the time, her body language and verbal expression were comparable to Def. Cowan, *avoidant* and *unapologetic*, fasey *naïve*, largely *posturing* me as breaking from the corporate social culture; *improper deflection*.

115.     (DISCOVERY REQUEST: FIRST ADAPT, ALL DISCIPLINARY RECORDS OF AGAINST CARLOS VELASQUEZ, VELACA @ AMAZON.COM, DUT7, DUT1)

116.     An allegation of STALKING/HARASSMENT begins here; it is also held here that it was a *defamation*; a statement of a person *unbecoming* to Management process was not in order, was not defined, nor was there any plan or program in place to clarify that.

117.     Subsequent, an Allegation of FORCED RESIGNATION also begins here; the failure to address and alleviate subjective objections, literally the Defendants Managers did not want to admit their own error, and so demurred in actual malice and *Breach of Contract*.

118.    Rel. to STALKING/HARASSMENT, the allegation here is that Def. Alvarez had personal objections to my taking the Process Assistant role; I had shifted from working under Def. Bridges to Def. Alvarez, had been placed back into my original role where I was sufficiently experienced to survive the PEAK season, and where subsequently Def. Alvarez had essentially contributed to the very problem he complained against by being unavailable.

119.    His subsequent hostility to allowing me to inform him, and the management culture at DUT7, betrays an intent to have conducted *entrapment* to commit *fraud*; *given* that some one or other associate *reported* that I was violating his limited policy, and given that the individual did not come to me (this may have been Melissa, or an Ambassador) to uphold it as a Standard Work Practice, it seems more than *plausible* that his absences were *planned absences* or at least *intentional* to promote a *wait and see* attitude which actually divested the organization from its *Earn Trust* business tenet.

120.    *Breach of Contract*, Def. Alvarez policy was effectively in contradiction to the *Earn Trust* tenet wherein his enforcement of it was as if *by its letter*, while it was a limited safety policy based not in misconduct but in *observable* Work Safety standards, standards which can change repeatedly and require direct oversight. Def. Alvarez provided no measurable basis for his own standard, and the behavior of his subordinates suggests they were intent to divest *trust,* rather than in shared commitment to *Fulfillment*.

121.

122.    It is possible he did so knowing that I was also missing lunches, and it is also possible he did so out of spite for Eric Turner, who had usurped a desirable authority. That

27

is, he foresaw that he could make a false declaration of *insubordination* that would be left *unquestioned, or* it was possible Def. Cowan *suborned* him into a false and malicious practice; it is likely Def. Alvarez harbors long-term animus for Eric Turner within *corporate relations* for more coveted promotional opportunities.

123.    The *false declaration* in the ADAPT process was a direct result of the undisclosed Safety Roundtable wherein I was characterized as hostile to a person, or persons, and whereafter Managers took*wait and see* attitude rather than approaching me directly, as if they regarded at the extreme of Amazon LLC behavioral policy, which prohibits disclosures for fear of any retaliation.

124.    What follows in the Narrative, I no longer interact with Def. Alvarez on an unrelated change in organization, but Def. Caldera shows repeated *animus* based in the interaction we had where I worked first with Def. Bridges, and later after Def. Bridges summary termination, with Margarita Wayman who engaged in a further plot to elaborate the culture of misleading statements.

125.    Thereby the allegation from this statement is that the Management team will be shown to have *pre-emptively retaliated* against me for anything from being good at the job, to behavioral and territorial issues.

126.    We will also be able to plausibly speculate that numerous critical and personal decisions made by these people were directly in their knowing misconduct, and an intent to magnify harm done in these incidences by stepping beyond the reach of the corporate infrastructure, or otherwise to manipulate the circumstance, just as they manipulated the victims of their abuse of the authority granted to them AMAZON LLC.

127.     We will also be able to show the higher level corporate network does not evaluate the dignitary conditions of its work site, DUT7 and instead labors to cement consensus based in the conclusions of authorities, and thereby we show that AMAZON LLC, as based in these people's clear misconducts, and even their failure to make genuine showing (overstep), has failed to maintain a policy for truth-telling in terms of how its membership defines pre-emption conditions of statements and the effect of statements.

128.     Essentially, subsequent narrative will show nearly two years of conspiracy among managers and some associates to commit STALKING, to issue FALSE DECLARATIONS, to BREACH CONTRACT by violating both generalized standard work tenets, and by violating behavioral policies.

129.     We will also have shown their clear intent to compromise the integrity of AMAZON LLC in their various deliberations.

## SECOND INCIDENCE

130.     On a second incident I was advised to meet Defs. Bridges and Caldera in the Management Office where Def. Bridges delivered a second ADAPT under the direct supervision of Def. Caldera.

131.     I read the document and immediately was surprised, but also definitely offended the discussion related to an injured Amazon Associate ("Jamie") had described me as contemptuous to her needs, while every component of our actual discussion was workable.

132.     She had provided to Def. Bridges some kind of relation of what I had said to her, in the course of a minute conversation I had told her she looked healthy and she had reminded me her recovery was in progress, and that she might require a break.

133.     I offered at the time of the conversation to bring an Ambassador to stand-in for her, and that implied that it could be offered at any time, but she declined at that moment and I advised I would return before too long.

134.     I do not recall at the time of this affidavit was produced what all I was doing, my routine tasks involved communicating with stowers on Stow Rates, standing for Associates who needed the restroom, picking up shipments, engaging individuals ad hoc on process and other matters, but it was about fifteen to twenty minutes where I was engaged when I received a radio communication from Def. Bridges vehemently asking me to meet him at the Labor Board.

135.     I recall being delayed for a short time, because I advised I would be there as soon as possible.

136.     Def. Bridges asked why I had neglected the Associate, and I advised him of the brief conversation we had, and he advised me of the solution he had worked out with her, was to position her *oppositely* from the one side of the conveyor belt to the other, which apparently had allowed her to decompensate for muscular discomfort on one side of her back.

137.     The "Puller" role at Amazon Distribution facilities positions Associates on one side of the conveyance for an extended time to *pull* packages pre-sorted for regional clusters, so most Associates experience moderate to sometimes severe discomfort facing a single direction, and sometimes change sides with one another to balance their approach.

138.     It is possible the Associate lodged a *retaliatory complaint,* or it is possible Def. Bridges took a *discriminatory* posture, in his mind the value of finding a *personal solution*

30

had disfavored *me* from *promoting* to manager; erstwhile, as related to the **first incidence,** it was not lost on him that Def. Alvarez had sought to undermine my successes as a Yard Marshall.

139.    So I refused to sign the document; additionally, Defs. Bridges and Caldera advised me the ADAPT was issued on an aggregate of complaints starting with a Safety Roundtable from much earlier in the year, and could not identify any real cause.

140.    They sought to portray me as *irascible*, but fabricated a circumstance wherein we *did not ever resolve the integrity of ADAPT,* so miscommunications and misperceptions by Associates were treated as exaggerated disciplinary challenges while it was obvious between the Management Team they engaged *gross misconduct.*

141.    Later, I wrote an Ethics Complaint on the subject, and Def. Kerri Alger advised me she would contact "Jamie" who had moved to Delaware (?), but returned a notice failing to find any infraction against Def. Bridges and Def. Caldera, and also failed to resolve my question on the substantivity of the issues involved.

142.    I also brought to Def. Alger's the **first incident,** and she promised she would look into it; the diligence required of her investigation should have sought several things, (1) Dates of Def. Alvarez Safety Rule; (2) Video Recording of Particular Shifts of Interest; (3) Personal Accounts of Management Associate behaviors.

143.    Def. Alger did adjust Def. Alvarez shift assignment away from mine, but took no other action to relieve me of the unethical prejudice.

144.    Def. Alger may have recognized the depth of the collateral problem, may have regarded her own familiarity with Def. Alvarez, or managers whom she may have thought

31

had *included* the Defendants to their circle, other members of the Management Team, the Pioneer Region was slowly expanding after 2017, and she may have thought it would not be a team-oriented play to conduct a whole investigation.

145.      The depth of animus at that point became relatively *severe,* while I did maintain *professional leverage* it was obvious to me the Management Team had lost integrity. I began deliberating more consistently on the credibility of an Ethics Complaint.

146.      Def. Cowan resigned at some point in that summer, and I felt it was related to the circumstance with Def. Bridges and another Level 4 Manager, both were under internal investigation for policy violations, and when the latter manager was terminated and another promoted off-site, the disruption in the continuity of the culture broke evenly for me and so I continued without complaint until later in the year.

**147.**      Def. Bridges was likely termination for Drug Abuse, and it was also confided to me he may have been terminated for Fraternization violations that could have appeared to a reasonable to be tortious, contemptuous at being passed over for Level 5 promotion, which Def. Alvarez had received *after* the **first incident.**

**148.**      Def. Bridges is a romantic, and may have blamed himself for having witnessed the disposition of the **first incident.**

149.      During this time, I was subjected to disciplinary revision rooted in bad instructional policies; the ATLAS dynamic track for Labor Tracking was broken, self-contradictory from week to week, contradicted actual Associate skill levels, a semi-automated spreadsheet to cross-reference associate *skills training* prior to *labor assignments* at the Start of Shift ("SOS"), and it was a sole point of *needs improvement* on site-wide metrics; literally every

week one of the Process Assistants or Site Managers would trigger a ATLAS level *alert* how an associate was not properly assigned a direct role.

150.    While these issues were not taken very seriously, they were later used to attempt to justify a *final written* warning; it was an entire year before that Labor Tracking System was sufficiently refined and flexible enough for actual implementation, not until Spring 2023.

### THIRD INCIDENT

151.    On 12/18/2022, after the termination of Def. Bridges, DUT7 Senior Site Leader Paul Kondrat promoted Def. Margarita Wayman to Level 4 manager, who had worked with Amazon.com for as long as I had, she delivered an ADAPT after interrogatory conducted by Human Resources Def. Celestia Leme accusing me of attempting to influence someone to commit theft.

152.    The interrogatory was conducted weeks after the conversation, I did not recall it with any significance, and recollected a brief anecdote I had made about the relative *efficiency* of Amazon production as related to the Break Room "Cantina," as I then learned it was named.

153.    The Associate was relatively new then, and because I had to observe individual standard work practices I had taken an opportunity to talk to the individual, and I can recall he was not impressed with my attempt at conversation.

154.    It is possible the Associate *retaliated* against me for provoking conversation, and intentionally misconstrued my statement.

155.    I admitted to Def. Leme how the conversation could not have taken on that much definition, but she misconstrued that and reported the issue.

33

156.      It now occurs to me her action there was *retaliatory,* after the 12/10/2022 complaint: an attempt to construct an *intimidation* culture; whether Def. Wayman had somehow solicited or encouraged Def. Leme, or whether it was solicited by other implication was not demonstrated to me.

157.      My Performance reviews were also aborted at this time, so that I suffered improper *animus* in the breakroom, increasing *ambiguity* on workplace tasks, and took less *confidence* at opportunities.

FOURTH INCIDENT

158.      On 12/18/2022, Def. Wayman delivered a second ADAPT tracking errors I claimed were *mechanical* at Labor Coding, that is, one or two errors versus a third error were then vulnerable to the same *mechanical* problems associated with the ATLAS dynamic labor tracker.

159.      The document also included an incidence not prior recorded, wherein the other Level 3 Process Assistant on our shift, Def. Shanese Walters, had requested me to record a labor change, and the request went unheard because I had engaged with an Associate at the conveyance.

160.      At the time, this was an atypical request; labor changes on that order were conducted either casually, Associated tasking with "Unloading" shipments would casually swap places with the Associate logged into the "Induction" scanner, and log scans for said associate, the *indirect* labor path.

FIFTH INCIDENCE

161.      On 1/20/2023 I filed an Ethics Complaint against Defs. Caldera and Walters for a *hostile takeover* of my Pick and Stage set up; I was obligated as the Stow section Process Assistant that week to make *labor assignments* for the remaining 2½ hours of the shift following the end of Sortation, I was advised a standard Pick Rate from Def. Wayman and had assigned the shift accordingly.

162.      Def. Caldera and Def. Walters executed a kind of pincer move, Def. Walters engaged me in a disagreement about an Associate who had been proceeding under an accomodation for a personal issue, who had been routinely assigned to conduct "Full Routes" wherein we assigned routes relatively *in advance* so that she could operate at an *accommodated* pace.

163.      Def. Walters disagreed with me *allowing* the associate that request, the Associate had expressed mild concern that stepping into a faster-pace could aggravate the injury, so it seemed appropriate to allow her to

164.      Def. Walters also attempted to bully another associate while her *accomodation* had lapsed, expressly because she wanted to veteranize associates in the role the *accomodated* individual had been routinely assigned; the associate would cry with pain when put into certain other roles, and Def. Walters was overzealous to instill her own *influence* and take "Ownership."

165.      It is possible Def. Caldera was ambitious to promote outside of Amazon, and had disassociated himself from the company psychologically, because he advised against respecting the Associate for tangible questions and needs, additionally he appears to have transgressed against the agreement he had made with Def. Bridges.

166.    Def. Caldera wanted to be perceived as very powerful, and experienced, but he often appeared *insecure* I think because he does not respect the *rights of workers,* and encouraged that behavior in Def. Walters largely because she communicated how *insecure* she felt, and how much she desired to overcompensate for personal inexperience and insecurity.

167.    The documentation related to these incidences, including the Human Resources responses, were *inconclusive* and failed to acknowledge the Complaint I presented, and did not apply the Code of Conduct, the language was too dismissive; the Human Resources officer may have expressed it in *derision* and *retaliation,* certainly the Defendants had no other reasonable expression.

168.    Other associates were queried on this matter, but its they were improperly zealous; these types of abuses have become more consistent with the Republican Party who are too insecure for leadership.

SIXTH INCIDENCE

169.    I was handed via email a notice I could appeal a *final written* warning for my misconduct issued by Def. Wayman, the appeal went to may favor although it could not hear my whole pleading on the subject, where I had direct standing.

170.    I spoke to a Senior Site Leader from out of State who found in my favor the *timing* for any *final written* notice had not been reached, however the invidual I spoke to did not elaborate any kind of *misapplication,* and failed to deter the issue.

SEVENTH INCIDENCE

36

171.    Defs. Caldera and Wayman had prior *retaliated* against me on the misplaced *final written,* and resurrected that issue within *one day* of the expiration of a ADAPT policy when I encountered a more frightening error.

172.    I experienced a minute, total lapse, like a *fugue state,* and skipped a routine low-level step and improperly coded between six and eight associates.

*173.*    The Management Team refused to hear that discussion, and Def. Wayman attempted to take satisfaction in failing to hear the discussion out, and failed to admit how the circumstance was not a routine disciplinary failure; how it was a result *intimidation* and *real contempt* at being *denied* the opportunity to have *terminated the plaintiff.*

174.    Def. Wayman pretended to be *zealous* to protect our site's *production history* in that ADAPT, but the defect was a direct result of her management ethics, and their inability to show *interest* in how I had represented myself directly to Leadership.

175.    There is a concurrent case filed in the United States District Court for the District of Utah, a fact to which the team was not apprised. I had posted on my Amazon Profile how one of my interests was "Complex Litigation," and none of them had ever asked me about it. The Amazon Profile is visible to anyone who has network access to review Associate Profiles, such L3+ Associates.

176.    It was obvious they had taken that as an improper social queue to conduct *coerced termination/resignation,* and demanded my complicity to their inherent violence against the *rights of workers.*

177.     I admitted the policy could be observed, but denied that it was the appropriate response to the circumstance; going forward, the Management Team was increasingly distant, and appeared increasingly incompetent.

178.     My performance reviews failed in these periods on the basis of those ADAPTS, against the circumstance of *Judicial Malpractice* which had upended my life, the Management Team sought more aggressive *invasions* against my *psyche* and *person,* and from that point forward, Level 1 Associates who were ambitious became increasingly *deflective* and framed my work *praxis* as incompetent, likely based in Management social queues.

179.     Def. Walters became increasingly *presumptive* as based in orchestrations conducted by Def. Caldera.

*180.*     Altogether, the Management Team *on the basis of their malpractices* had elected *to favor* Def. Walters and at that time I suffered more extreme dispositions in the workplace, my hard work was being treated as a *defective* leadership approach, even while I continued to work at a critical pace, and engineer new solutions *against* Management adversity.

181.     Defendants actively took part in a quiet *stalking* exercise, and appear to have coached other associates into constructive *derision* over my person.

EIGHTH INCIDENCE

182.     On 5/10/23 I filed an Ethics Complaint against Def. Caldera and Def. Alger.

183.     I had put together a "Mismanagement Complaint," had spoken to our then-site Leader, Def. Kevin Sargeant, who was not helpful and attempted to encourage me to take the fall for the Team, to remain focused on work, and not to call into question site Ethics.

184.    The Ethics Complaint I filed was separate, and accused the Defendants of having colluded to protect both the internal image of the DUT7 site, and also to protect Def. Caldera who at the time had taken a reccommendation from Amazon for Promotion, one which came directly at my expense.

185.    Defs. Alvarez, Caldera, and Cowan had robber me in part of "Ownership" over taking advanced leadership steps independent of their supervision, they sought in harming and stalking me to insinuate themselves with leadership who are at a higher level, who may prefer to discourage Leadership independence than admit corrections.

186.    I had repaired Delivery Times at our station, while we were at risk before the holiday and routinely finishing late; Regional managers, including our own, had somewhere decided it was not worth the effort to fix it before the actual holiday schedule kicked in.

187.    I reached out, was denied by a more Senior Manager, and then found the Responsible Manager who found the Lane and validated a transaction; I signed off for our site as I was the only other officer with standing aside from the Level 8, Senior Site Leader Def. Paul Kondrat.

188.    It is very possible the Management Team used the episode as a point of entry to gain advantage against the Senior Site Leader prior to his resignation in 2023.

189.    Having stolen that attribution, Def. Caldera had finally given me a task at self-humiliation and demanded that I routinely ask Level 1 Associates what I could do better for them, which I followed through with only minutely to recognize I was largely in good favor with them.

190.     I later spoke to both Def. Caldera and Wayman about dissolving that task, to see if they could improve their outlook without putting me beneath wrongful suppression, and was flatly denied by both.

191.     Once Def. Caldera left the site, the hostility that remained had been insinuated into my working relationship with Defs. Shanese Walters and David Olave, who had both played aggressively into the pattern of mismanagement, and were incompetent to take fewer risks, and to appear beyond either conversation or advice.

192.     Once I realized the site leadership and the Human Resources altogether were refusin to confer me upon efficient standing, the same way as a criminal Republican Party, I became both afraid for my life and afraid that I would suffer repression underneath the gloating and knowing expressions of Def. Walters and Def. Olave, both of whom took wrong attribution in a complex stalking exercise initiated by Def. Alvarez and strategically aggravated by Defs. Caldera and Wayman.

193.     The Ethics Complaint sought review of the process undertaken by Human Resources, and was referred to Def. Amy Nally who was Corporate Human Resources person, and could not clarify any part of my question, and refused to find a means to relieve me of their disposition.

194.     It was clear the entirety of the culture was intent on constructive termination, and coerced failure; it was as if they had co-opted the criminal spirit of Republican Judiciary, who are not friends to the people before the party.

OTHER INCIDENCE

1.

195.    We had instance of an Associate who, for whatever reason, carried an aggressive attitude about work, and was primarily engaged in the whole process as a high-functioning worker.

196.    But he instigated a few disagreements for his own reasons, primarily on safety questions. Whether he was allowed to sit inside a cart, and also being very emphatic that he felt the entire process was at least little bit unsafe, and that I, in particular, could not guarantee by any degree of correction or instruction.

197.    He later became injured, and so was given a task that was suitable for the severity of his injury and apparently he did not like it. I can recall him more or less threatening me with disciplinary sanction for harassment while I was basically trying to correct part of the process he was engaged in; we were getting a lot of packages on the floor and I had to repeat myself several times.

198.    These were related incidents taking place just before that associate and his significant other resigned.

199.    What I recognized in his behavior, was his consciousness of how badly disfavored I was on site; I felt like he was being angry for me. There he was, completely misbehaving for weeks on end, and he was still better regarded than I was because I was vulnerable to lies about work place ethics.

2.

200.    I was denied access to Amazon Technical Academy on plausibly dubious terms; whereall the impositions of Def. Bridges and Def. Caldera coincided with the decisional timing for ATA, which would have pre-empted furtherance of the disposition.

201.    The program discriminates against associates who were not in good standing at the time decisions are made; it was a plainly discriminatory practice they were engaged in, and they took vicarious harm; as did Def. Alger who attempted to convince the ADAPT was not consistent with that parameter of ATA review.

202.    Altogether they present the appearance of having directly created an image of me as someone hostile, and stupid; the very people they became out of contempt for the workplace, and the American worker.

3.

203.    DUT7 site was investigated repeatedly in 2023 for cultural defects, problems with Associate and Manager behavior; and any of these circumstances may shed light on causes and even liabilities.

204.    s/Carlos Velasquez,    Carlos Velasquez    Digitally signed by Carlos Velasquez
Date: 2025.08.11 16:03:46 -06'00'

205.    Pro Se Plaintiff in Authentic Victim's Capacity

206.    Civil Bureaucratic Federalist